## PALERMO v. UNITED STATES.

No. 471.  Argued April 28, 1959.—Decided June 22, 1959.

*Wyllys S. Newcomb* argued the cause for petitioner. With him on the brief was *John A. Wells*.

*Ralph S. Spritzer* argued the cause for the United States.  On the brief were *Solicitor General Rankin, Assistant Attorney General Rice, Joseph F. Goetten* and *Lawrence K. Bailey*.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Petitioner was convicted of knowingly and willfully evading the payment of income taxes for the years 1950, 1951 and 1952.  A substantial part of the alleged evasion was failure to report income from dividends.  Among the Government's exhibits at trial was a record, presum-

ably contemporaneous and in the petitioner's handwriting, of dividends received during 1951 and 1952. This record reflected an amount of dividend income for 1951 substantially larger than that reported on the 1951 return. Petitioner contended that this record had been turned over to the accounting firm which regularly prepared his return, Arthur R. Sanfilippo & Co., in early 1952 for use in preparing his 1951 return, but that the figures had not been accurately entered on the return by the accountants. The Government's contention was that the record had not been given to the accounting firm until early 1953, subsequent to the initiation of the investigation of petitioner's tax affairs and long after the filing of the 1951 return. The time at which the record had been given to the accountants thus became directly relevant to the issue of criminal intent in the charge against the petitioner. Arthur R. Sanfilippo, an important government witness and the principal partner in the accounting firm, testified that his firm had not received the handwritten record of dividend income until early 1953.

Prior to the trial, on July 16, 1956, during the course of an interrogation by agents of the Internal Revenue Service, Sanfilippo had been unable to recall when the dividend record had been received. More than a month later, August 23, 1956, Sanfilippo had met with revenue agents to verify and sign the transcript of his earlier testimony. At this meeting he executed a supplementary affidavit reciting that he wished to clarify his original answers and that he remembered that his firm had not received the dividend record until after revenue agents had begun their investigation of petitioner's tax returns. A memorandum of the conference at which this affidavit was executed was made by one of the agents present. On cross-examination of Sanfilippo the defense demanded and received various documents including the transcript of the July 16 interrogation and the August 23

affidavit. The defense also requested production of any memoranda, or of any part thereof summarizing what Sanfilippo had said, which had been made of the August 23 conference. The trial judge denied this request on the ground that the Act of September 2, 1957, 71 Stat. 595, 18 U. S. C. § 3500—the so-called "Jencks" Act—governing the production of statements made to government agents by government witnesses, precluded production of the requested memorandum since it was not within the definition of "statement" in (e) of the Act.[1] The Court of Appeals for the Second Circuit affirmed. 258 F. 2d 397. Together with several other cases raising Jencks Act problems, we granted certiorari, 358 U. S. 905, to determine the scope and meaning of this new statute.

Accurate analysis of these problems as a basis of their appropriate solution requires due appreciation of the background against which the statutory terms must be projected.

Exercising our power, in the absence of statutory provision, to prescribe procedures for the administration of justice in the federal courts, this Court, on June 3, 1957, in *Jencks* v. *United States,* 353 U. S. 657, decided that the defense in a federal criminal prosecution was entitled, under certain circumstances, to obtain, for impeachment purposes, statements which had been made to government agents by government witnesses. These statements were therefore to be turned over to the defense at the time of cross-examination if their contents related to the subject matter of the witness' direct testimony, and if a demand had been made for specific statements which had been written by the witness or, if orally made, as recorded by

---

[1] We reject the Government's contention that, at trial, petitioner asserted only that the statute did not cover his request for production, and failed to assert that, if the statute was applicable, the memorandum could be produced under its terms. We find that objection to the interpretation of the statute was adequately made.

agents of the Government. We also held that the trial judge was not to examine the statements to determine if they contained material inconsistent with the testimony of the witness before deciding whether he would turn them over to the defense. Once the statements had been shown to contain related material only the defense was adequately equipped to decide whether they had value for impeachment. This decision only concerned production and therefore did not purport to modify the laws of evidence governing the admissibility of prior statements of a witness.

The decision promptly gave rise to sharp controversy and concern. The day following our opinion the House of Representatives was told that the decision in *Jencks* posed a serious problem of national security and that legislation would be introduced. 103 Cong. Rec. 8290. The same day H. R. 7915, the first of eleven House bills dealing with what became the Jencks problem, was introduced in the House.[2] Defendants' counsel began to invoke the *Jencks* decision to justify demands for production far more sweeping than that involved in *Jencks,* and under circumstances far removed from those of that case, and some federal trial judges acceded to those excessive demands.[3] The Department of Justice, concerned over these rapid intrusions of *Jencks* into often totally unrelated

[2] 103 Cong. Rec. 8327. The other House bills were H. R. 8225, 103 Cong. Rec. 9572; H. R. 8243, 103 Cong. Rec. 9746; H. R. 8335, 103 Cong. Rec. 10181; H. R. No. 8341, 103 Cong. Rec. 10181; H. R. 8388, 103 Cong. Rec. 10403; H. R. 8393, 103 Cong. Rec. 10403; H. R. 8414, 103 Cong. Rec. 10547; H. R. 8416, 103 Cong. Rec. 10547; H. R. 8423, 103 Cong. Rec. 10547; H. R. 8438, 103 Cong. Rec. 10589.

[3] Many of the cases in the lower federal courts after *Jencks* and prior to the enactment of the statute are collected in the statement of the Attorney General contained in H. R. Rep. No. 700, 85th Cong., 1st Sess., and in S. Rep. No. 569, 85th Cong., 1st Sess. See also S. Rep. No. 981, 85th Cong., 1st Sess.; 103 Cong. Rec. 15939–15941.

areas, drafted legislation to clarify and delimit the reach of *Jencks*. See 103 Cong. Rec. 15781. On June 24, 1957, this legislation was introduced into the Senate by Senator O'Mahoney acting for himself and several other Senators. 103 Cong. Rec. 10057. After study by a subcommittee of the Judiciary Committee the bill was reported out, 103 Cong. Rec. 10601, then withdrawn and a completely new measure substituted. 103 Cong. Rec. 14913. When the bill reached the floor for debate Senator O'Mahoney proposed an amendment in the nature of a substitute which was adopted, 103 Cong. Rec. 15938, and the bill passed the Senate on August 26. *Ibid.* In the House the original H. R. 7915, after being amended in Committee, see 103 Cong. Rec. 10925, was passed on August 27; 103 Cong. Rec. 16130, and then substituted for the text of the Senate bill. 103 Cong. Rec. 16131. The two versions went to Conference. The Conference Report was agreed to by the Senate on August 29, 103 Cong. Rec. 16490, and by the House the next day. 103 Cong. Rec. 16742. The Act was approved on September 2, and became law as § 3500 of the Criminal Code, 18 U. S. C.[4] Congress

---

[4] The statute provides:

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) After a witness called by the U1 'ed States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate

had determined to exercise its power to define the rules that should govern in this particular area in the trial of criminal cases instead of leaving the matter to the law-making of the courts.

---

to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

"(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

"(e) The term 'statement,' as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

In almost every enactment there are gaps to be filled and ambiguities to be resolved by judicial construction. This statute is not free from them. Here, however, the detailed particularity with which Congress has spoken has narrowed the scope for needful judicial interpretation to an unusual degree. The statute clearly defines procedures and plainly indicates the circumstances for their application. Since this case is the first calling for authoritative exposition of an Act that frequently comes into use in federal criminal prosecutions we deem it appropriate to explicate the construction of the statute required by the circumstances of this case.

1. Subsection (a) requires that no statement of a government witness made to an agent of the Government and in the Government's possession shall be turned over to the defense until the witness has testified on direct examination. This section manifests the general statutory aim to restrict the use of such statements to impeachment. Subsections (b), (c) and (d) provide procedures for the production of "statements," and for the consequences to the Government of failure to produce. Subsection (e) restrictively defines with particularity the term "statement" as used in the three preceding sections. The suggestion that the detailed statutory procedures restrict only the production of the type of statement described in subsection (e), leaving all other statements, e. g., non-verbatim, non-contemporaneous records of oral statements, to be produced under pre-existing rules of procedure as if the statute had not been passed at all, flouts the whole history and purpose of the enactment. It would mock Congress to attribute to it an intention to surround the production of the carefully restricted and most trustworthy class of statements with detailed procedural safeguards, while allowing more dubious and less

reliable documents a more favored legal status, free from safeguards in the tournament of trials. To state such a construction demonstrates its irrationality; the authoritative legislative history precludes its acceptance.

To be sure, the statute does not, in so many words, state that it is the exclusive, limiting means of compelling for cross-examination purposes the production of statements of a government witness to an agent of the Government. But some things too clearly evince a legislative enactment to call for a redundancy of utterance. One of the most important motive forces behind the enactment of this legislation was the fear that an expansive reading of *Jencks* would compel the undiscriminating production of agent's summaries of interviews regardless of their character or completeness. Not only was it strongly feared that disclosure of memoranda containing the investigative agent's interpretations and impressions might reveal the inner workings of the investigative process and thereby injure the national interest, but it was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations. The committee reports of both Houses and the floor debates clearly manifest the intention to avoid these dangers by restricting production to those statements specifically defined in the bill.[5] Indeed both the House

---

[5] See, *e. g.*, H. R. Rep. No. 700, 85th Cong., 1st Sess.; S. Rep. No. 569, 85th Cong., 1st Sess.; S. Rep. No. 981, 85th Cong., 1st Sess. The statements in the reports are frequent and clear. There are many like expressions on the floor of both chambers. For example, there was a lengthy debate in the Senate over an amendment which would have restricted the type of statement which could be produced beyond the limitations already incorporated in the Senate bill. The entire debate proceeded on the explicit assumption that only those

and Senate bills as they went to Conference explicitly so stated. See 103 Cong. Rec. 16130; 103 Cong. Rec. 16125. Nothing in the Conference Reports or the limited debate following Conference intimated the slightest intention to change the exclusive nature of the measure. Indeed the reports and debate proceeded on the explicit assumption that the bill retained as a major purpose the barring of all statements not specifically defined.[6] The purpose of the Act, its fair reading and its overwhelming legislative history compel us to hold that statements of a government witness made to an agent of the Government which cannot be produced under the terms of 18 U. S. C. § 3500 cannot be produced at all.

2. Since the statutory procedures are exclusive they constitute the rule of law governing the production of the statement at issue in this case and it becomes necessary to determine the scope and meaning of the statutory definition of "statement" contained in (e). Clause (1) of (e) permits the production of "a written statement made by said witness and signed or otherwise adopted or approved by him . . . ." Although some situations may arise, creating peripheral problems of construction, its import is clear. Clause (2) widens the definition of "statement" to include "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement." Clearly this provision allows the production of mechanical or stenographic recordings of oral state-

statements which were enumerated in the bill could be produced at all. 103 Cong. Rec. 15930–15935. See also 103 Cong. Rec. 16116. There are many similar expressions during the debates.

[6] See legislative history summarized in Appendix A, *post*, p. 356.

ments, even though later transcribed. A preliminary problem for determining that the statement now before us may be produced is whether the statutory phrase "other recording" allows an even wider scope for production. We find the legislative history persuasive that the statute was meant to encompass more than mere automatic reproductions of oral statements.[7]

However, such a finding is only the beginning of the task of construction. It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment.[8] It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis on "substantially verbatim recital," and "continuous, narrative statements made by the witness recorded verbatim, or nearly so . . . ," see Appendix B, *post*, p. 358, that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation. We think it consistent with this legislative history,[9] and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substan-

---

[7] See legislative history summarized in Appendix B, *post,* p. 358.

[8] See, *e. g.*, 103 Cong. Rec. 16739. See also many statements to the same effect in the House and Senate Reports.

[9] See legislative material cited and quoted in Appendix B, *post,* p. 358.

tial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions. In expounding this standard we do not wish to create the impression of a "delusive exactness." The possible permutations of fact and circumstance are myriad. Trial courts will be guided by the indicated standard; informed by fidelity to the congressional purposes we have outlined. There is nothing impalpable about these provisions. Since we feel the statutory standard has guiding definiteness, it would be idle to attempt a minute enumeration of particular situations to which it is to be applied. Such a vain attempt at forecasting myriad diversities with minor variance is as futile and uncalled for in this as in so many other areas of the law. That is what the judicial process is for—to follow a generally clear direction in dealing with a new diversity as it may occasionally arise. Final decision as to production must rest, as it does so very often in procedural and evidentiary matters, within the good sense and experience of the district judge guided by the standards we have outlined,[10] and subject to the appropriately limited review of appellate courts.[11]

---

[10] Of course the statute does not provide that inconsistency between the statement and the witness' testimony is to be a relevant consideration. Neither is it significant whether or not the statement is admissible as evidence.

[11] The statute as interpreted does not reach any constitutional barrier. Congress has the power to prescribe rules of procedure for the federal courts, and has from the earliest days exercised that power. See 37 Harv. L. Rev., at 1086 and 1093–1094, for a collection of such legislation. The power of this Court to prescribe rules of procedure and evidence for the federal courts exists only in the absence of a relevant Act of Congress. See *Funk* v. *United States*, 290 U. S. 371,

3. The statute itself provides no procedure for making a determination whether a particular statement comes within the terms of (e) and thus may be produced if related to the subject matter of the witness' testimony. Ordinarily the defense demand will be only for those statements which satisfy the statutory limitations. Thus the Government will not produce documents clearly beyond the reach of the statute for to do so would not be responsive to the order of the court. However, when it is doubtful whether the production of a particular statement is compelled by the statute, we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination. Indeed, any other procedure would be destructive of the statutory purpose. The statute governs the production of documents; it does not purport to affect or modify the rules of evidence regarding admissibility and use of statements once produced. The Act's major concern is with limiting and regulating defense access to government papers, and it is designed to deny such access to those statements which do not satisfy the requirements of (e), or do not relate to the subject matter of the witness' testimony. It would indeed defeat this design to hold that the defense may see statements in order to argue whether it should be allowed to see them.

It is also the function of the trial judge to decide, in light of the circumstances of each case, what, if any, evi-

---

382; *Gordon* v. *United States,* 344 U. S. 414, 418. Much of the law of evidence and of discovery is concerned with limitations on a party's right to have access to, and to admit in evidence, material which has probative force. It is obviously a reasonable exercise of power over the rules of procedure and evidence for Congress to determine that only statements of the sort described in (e) are sufficiently reliable or important for purposes of impeachment to justify a requirement that the Government turn them over to the defense.

dence extrinsic to the statement itself may or must be offered to prove the nature of the statement. In most cases the answer will be plain from the statement itself. In others further information might be deemed relevant to assist the court's determination. This is a problem of the sound and fair administration of a criminal prosecution and its solution must be guided by the need, reflected in so much of our law of evidence, to avoid needless trial of collateral and confusing issues while assuring the utmost fairness to a criminal defendant. See, *e. g., Nardone* v. *United States,* 308 U. S. 338, 342.

In light of these principles the case before us is clear. Both the District Court and the Court of Appeals correctly held that the sole standard governing production of the agent's memorandum of his conference with Sanfilippo was 18 U. S. C. § 3500. The district judge and a unanimous Court of Appeals held that the statement was not within the definition of statement in (e) as properly understood by them. We have examined the statement and the record and find that the determination of the two courts below was justified and therefore must be sustained.[12] It would bespeak a serious reflection on the conscience and capacity of the federal judiciary if both a trial judge and a Court of Appeals were found to have disregarded the command of Congress, duly interpreted,

---

[12] The statement consists of a brief agent's summary, of approximately 600 words, of a conference lasting $3\frac{1}{2}$ hours. It was made up after the conference and consists of several brief statements of information given by Sanfilippo in response to questions of the agent. The typed agent's memorandum is clearly not a virtually verbatim narrative of the conference but represents the agent's selection of those items of information deemed appropriate for inclusion in the memorandum. Thus by applying the governing standard set forth at pp. 352 and 353, *supra,* it is clear that the lower courts did not err in refusing to hand the statement over to the defense.

for making available a prior statement of a government witness in a case. Against such a contingency there is always the safeguard of this Court's reviewing power.

*Affirmed.*

[For opinion of MR. JUSTICE BRENNAN, joined by THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS, see *post*, p. 360.]

## APPENDIX A TO OPINION OF THE COURT.

SUMMARY OF LEGISLATIVE HISTORY DEMONSTRATING THE INTENT OF THE CONFERENCE MEASURE TO RETAIN AS A PRIMARY PURPOSE OF THE ACT A PROHIBITION OF PRODUCTION OF ALL STATEMENTS NOT DESCRIBED IN SUBSECTION (E). (SEE PP. 350–351, ANTE.)

The bills as they went to Congress contained explicit provisions making them exclusive. For example, the Senate bill provided in subsection (a):

> "In any criminal prosecution brought by the United States, no statement or report of a Government witness or prospective Government witness (other than the defendant) made to an agent of the Government which is in the possession of the United States shall be the subject of subpena, or inspection, except, if provided in the Federal Rules of Criminal Procedure, *or as provided in paragraph (b) of this section.*"
> (Emphasis added.) 103 Cong. Rec. 16130.

The House bill contained a similar provision.

Although the last phrase of this section was dropped out when the section was rewritten to eliminate reference to the Federal Rules of Criminal Procedure, see 103 Cong. Rec. 16488; H. R. Rep. No. 1271, 85th Cong., 1st Sess., there is no indication that its omission was intended

to work a silent and radical change in the entire concept and purpose of the Act. Both the Conference Report of the House Managers and the floor remarks of the Senate Conferees enumerate the particular changes which had been made to meet earlier specific differences and objections. No mention is made, nor can an intimation be found, of any intention to change the exclusive nature of the measure. The House Conference Report enumerates the specific changes and then states that "To remove any doubt as to the kinds of statements affected by the bill as agreed to by the conferees, a new paragraph 'e' was added . . . expressly defining the term 'statement.' " H. R. Rep. No. 1271, 85th Cong., 1st Sess. 3. In the Senate, Senator O'Mahoney, in response to a question, gave the specific changes which had been made in the bill by the Conference, and he did not give the slightest indication that it had lost its exclusive nature. 103 Cong. Rec. 16487.

What small debate there was following the Conference Report supports the conclusion that no change in the exclusiveness of the bill was intended. For example, Senator O'Mahoney, introducing the conference measure, stated that, "[t]here was some fear upon the part of the Department of Justice that the Senate bill would create a greater latitude for the examination of irrelevant reports of agents. The language which was devised by the conferees has cleared up the doubts . . . ." 103 Cong. Rec. 16487. See also 103 Cong. Rec. 16488–16489. In the House, Representative Keating, one of the Conferees, explained that "The conferees provided that the only statements a defendant could see, and then only in the courtroom were those actually signed or formally approved by the witness or a stenographic verbatim recital of a statement made by a witness which is recorded contemporaneously with the making of such oral statement.

In other words, only those statements need be produced in court by the Government which could be shown in court to impeach the credibility of the witness." 103 Cong. Rec. 16739. See also 103 Cong. Rec. 16742.

### APPENDIX B TO OPINION OF THE COURT.

PARTIAL SUMMARY OF LEGISLATIVE HISTORY BEARING ON THE PROPER CONSTRUCTION OF SUBSECTION (E).
(SEE PP. 351 AND 352, ANTE.)

The original Senate bill, as passed by the Senate, allowed the production of "any transcriptions or records of oral statements made by the witness to an agent of the Government . . . ." See 103 Cong. Rec. 16130. During the course of the Senate debate an amendment had been offered to limit this provision to mechanical transcriptions or recordings. See 103 Cong. Rec. 15930–15931. This amendment was rejected after Senator O'Mahoney, sponsor of the legislation, had argued that it would leave the bill too "limited." "All we are asking," he stated, "is that the records which are relevant and competent, which deal with the oral statements made by Government witnesses whom the Government puts on the stand, with respect to the matters concerning which they testify, be made available." 103 Cong. Rec. 15932. Thus the bill as it left the Senate was clearly not confined to automatic reproductions of oral statements, although its further reach was not explicitly demarcated.

The House bill, as passed, allowed only the production of written statements signed by the witness or otherwise adopted or approved. 103 Cong. Rec. 16125. The present language emerged from the Conference.

Senator O'Mahoney, sponsor of the original Senate bill and one of the Senate Conferees, in submitting the conference bill, made it clear that (e) "would include a memo-

randum made by an agent of the Government of an oral statement made to him by a Government witness . . . ." 103 Cong. Rec. 16488. Senator Javits then asked:

> ". . . what has been done with the so-called records provision is to tie it down to those cases in which the agent actually purports to make a substantially verbatim recital of an oral statement that the witness has made to him—not the agent's own comments or a recording of his own ideas, but a substantially verbatim recital of an oral statement which the witness has made to him, and as transcribed by him; is that correct?" *Ibid.*

Senator O'Mahoney replied, "Precisely." Thus although the Senate history indicates that the bill was restricted to a "substantially verbatim recital," it is apparent that the Act was not designed to be restricted to mere mechanical transcription

The proceedings in the House are less clear. It is true that Representative Keating, one of the House Conferees, did say that only stenographic verbatim recitals need be produced. 103 Cong. Rec. 16739. But this was said in reply to Representative Celler's statement that the conference measure was as liberal as the original Senate bill. Representative Celler was also a House Conferee. The report of the House Managers, signed by all the House Conferees, after pointing out that the term "statement" had been defined in the bill, stated:

> "It is believed that the provisions of the bill as agreed to by the conferees are in line with the standard enunciated by Judge George H. Moore of the eastern district of Missouri in . . . *U. S.* v. *Anderson* . . . which is set forth at page 14552 [*sic*] of the daily Congressional Record of August 26, 1957." H. R. Rep. No. 1271, 85th Cong., 1st Sess. 3.

In the opinion referred to, Judge Moore had explicitly limited the type of oral statement which could be produced under the *Jencks* decision to

". . . only continuous, narrative statements made by the witness recorded verbatim, or nearly so, and does not include notes made during the course of an investigation (or reports compiled therefrom) which contain the subjective impressions, opinions, or conclusions of the person or persons making such notes." 103 Cong. Rec. 15940.

This standard, explicitly incorporated into the House Report, has a dual significance. It not only goes beyond mechanical or stenographic statements, in defining the statements which must be made available to the defense, but indicates that once beyond that point a very restrictive standard is to be applied.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, concurring in the result.

I concur in the result but see no justification for the Court's ranging far afield of the necessities of the case in an opinion essaying *obiter* a general interpretation of the so-called "Jencks Act," 18 U. S. C. (Supp. V) § 3500. Many more concrete cases must be adjudicated in the District Courts before we shall be familiar with all the problems created by the statute.

We of this Court, removed as we are from the tournament of trials, must be careful to guard against promulgating general pronouncements which prevent the trial judges from exercising their traditional responsibility. The Court's opinion well observes that the hope for a fair administration of the statute rests in the final analysis with its responsible application in the federal trial courts.

This responsibility of the federal trial judge, it goes without saying, is not to be delegated to the prosecutor. Questions of production of statements are not to be solved through one party's determination that interview reports fall without the statute and hence that they are not to be produced to defense counsel or to the trial judge for his determination as to their coverage. I am confident that federal trial judges will devise procedural methods whereby their responsibility is not abdicated in favor of the unilateral determination of the prosecuting arm of the Government.

Congress had no thought to invade the traditional discretion of trial judges in evidentiary matters beyond checking extravagant interpretations of our decision in *Jencks* v. *United States,* 353 U. S. 657, which were said to have been made by some lower courts. Indeed Congress took particular pains to make it clear that the legislation "reaffirms" that decision's holding that a defendant on trial in a criminal prosecution is entitled to relevant and competent reports and statements in possession of the Government touching the events and activities as to which a government witness has testified at the trial. S. Rep. No. 981, 85th Cong., 1st Sess., p. 3. And see H. R. Rep. No. 700, 85th Cong., 1st Sess., pp. 3, 4. I see no necessity in the circumstances of this case which calls for a decision whether § 3500 is the sole vehicle whereby production of prior statements of government witnesses to government agents may be made to the defense. Certainly nothing in the statute or its legislative history justifies our stripping the trial judge of all discretion to make nonqualifying reports available in proper cases. Take the case of a memorandum of a government agent simply stating that a person interrogated for several hours as to his knowledge of the defendant's alleged criminal transactions, denied any knowledge of

them. Then suppose that person is called as a government witness at the trial and testifies in great detail as to the defendant's alleged criminal conduct. The agent's summary would not be a detailed account of the several hours' interrogation of the witness by the Government, and would not meet the definition of statement in subsection (e) of the statute; but it is inconceivable that Congress intended, by the *Jencks* statute, to strip the trial judge of discretion to order such a summary produced to the defense. Even the Government, in oral argument, conceded that the statute did not strip the district judges of discretion to order production of such a statement under some circumstances.[1] There is an obvious constitutional problem in an interpretation that the statute restrains the trial judge from ordering such a statement produced. Less substantial restrictions than this of the common-law rights of confrontation of one's accusers have been struck down by this Court under the Sixth Amendment. See *Kirby* v. *United States*, 174 U. S. 47. And in such circumstances, there becomes pertinent the command of that Amendment that criminal defendants have compulsory process to obtain witnesses for their defense. See *United States* v. *Schneiderman*, 106 F. Supp. 731, 738. It is true that our holding in *Jencks* was not put on constitutional grounds, for it did not have to be; but it would be idle to say that the commands of the Constitution were not close

---

[1] In response to a case put similar to the one given here, government counsel suggested that the primary remedy of the defendant was to call the interviewer. Of course this would only be adequate if the defense had some reason to believe that an interview of such character had taken place and if the witness recalled the interviewer's name. Pressed further as to cases of the nonavailability of the interviewer, government counsel made it clear that "I would certainly not want to carry the burden of saying that in some extraordinary situation where there was no other possible way of getting hold of it- [the summary] that there might not be exceptions read into the statute—what I am talking about now is the normal, ordinary case."

to the surface of the decision; indeed, the Congress recognized its constitutional overtones in the debates on the statute.[2]

No express language of the statute forbids the production, after a witness has testified, of any statement outside the coverage of the definition in subsection (e), and certainly the legislative history is no adequate support for reading an absolute prohibition into it. It is true that until the Conference Report the bill contained a provision making it in terms exclusive; but this language was deleted in Conference. I should think this change would support an inference negating any absolute exclusivity. To be sure, the change was not explained in the hurried floor discussions which followed the agreement in Conference, in the hectic closing days of the session,[3] but the absence of an explanation for the change can argue in favor of its being taken at face value. Certainly this Court should not decide the contrary against the backdrop of a serious question of potential invasion of Sixth Amendment rights. This is not to ignore the obvious intent of Congress that the statute provide the primary tests of what the Government should produce; it is only to recognize that it is not inconsistent with achievement of the statute's aim to require the production of statements outside the scope of the statute where the fair administration of criminal justice so demands. And certainly the statute cannot be said to be exclusive where the Constitution demands production. Of course, the trial judge may fashion procedural safeguards as to those producible statements lying outside the statute's purview, perhaps by analogy to the statutory procedures for the excision of irrelevant matter.

---

[2] See H. R. Rep. No. 700, 85th Cong., 1st Sess., p. 4; S. Rep. No. 981, 85th Cong., 1st Sess., p. 3; 103 Cong. Rec. 15928, 15933, 16489.

[3] Copies of a statement analyzing the conference version were not even available to the Senate due to the press of time. See 103 Cong. Rec. 16488–16489.

It is sufficient to say in this case that the summary in controversy does not appear to fall within the category of statements, outside the definition in subsection (e), as to which the trial judge's discretion might be exercised.[4] Decision need turn on no broader ground. Cf. *Lee* v. *Madigan*, 358 U. S. 228, 230–231. What was stated in the agent's summary was already known in every important detail to the defense from the transcript of the interview of July 16 and the affidavit of August 23.

The summary in this case does not present the question whether the statute requires the production of a statement which records part of, but not the entire interview between the witness and the government agent. This is a problem which also should be left to the development of the interpretive case law, and in fact I do not read the Court's opinion as essaying a definitive answer. It is a problem I suppose which would be raised by a stenographic, electrical or mechanical transcript of only part of an interview. There is nothing in the legislative history of the statute to indicate that a stenographic transcript of a 10-minute segment of an hour's interview would not be producible under the statute. If such a transcript would be producible, how distinguish a substantially faithful reproduction, made by the interviewer from his notes or from memory, of any part of the interview? Since, as the Court's opinion concedes, statements made up from interviewer's notes[5] are not *per se* unproducible, one would

---

[4] Of course if the memorandum had been one falling within the statute, I need hardly add that the judge would have had no discretion to refuse to order its production to the defense, in the light of the statute's affirmative command.

[5] I might say in passing that the Court's emphasis on interviewer's notes as a basis of producible interview records seems wholly devoid of any real support in the text of the statute or in the legislative materials cited by the Court.

·suppose that a summary, part of which gave a substantial verbatim account of part of the interview, would, as to that part, be producible under the statute. Certainly a statement can be most useful for impeachment even though it does not exhaust all that was said upon the occasion. We must not forget that when confronted with his prior statement upon cross-examination the witness always has the opportunity to offer an explanation. The statute is to be given a reasonable construction, and the courts must not lose sight of the fact that the statute regulates *production* of material for possible use in cross-examination, and does not regulate *admissibility* into evidence—as the Court properly observes. Here too, the constitutional question close to the surface of our holding in *Jencks* must be borne in mind.

I repeat that Congress made crystal clear its purpose only to check extravagant interpretations of *Jencks* in the lower courts while reaffirming the basic holding that a defendant on trial should be entitled to statements helpful in the cross-examination of government witnesses who testify against him. Although it is plain that some restrictions on production have been introduced, it would do violence to the understanding on which Congress, working at high speed under the pressures of the end of a session, passed the statute, if we were to sanction applications of it exalting and exaggerating its restrictions, in disregard of the congressional aim of reaffirming the basic *Jencks* principle of assuring the defendant a fair opportunity to make his defense. Examination of the papers so sedulously kept from defendant in this case and companion cases does not indicate any governmental interest, outside of the prosecution's interest in conviction, that is served by nondisclosure, and one may wonder whether this is not usually so. There inheres in an overrigid interpretation and application of the statute the hazard

of encouraging a practice of government agents' taking statements in a fashion calculated to insulate them from production. I am confident that the District Courts will bear all these factors in mind in devising practical solutions to the problems of production in the many areas which cannot fairly be said to be determined by the affirmance of the judgment in this case.