**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Alfred S. CALABRESE and John M.
Delzoppo, Defendants-Appellants.**

**No. 19316.**

United States Court of Appeals
Sixth Circuit.

Jan. 15, 1970.

Certiorari Denied April 6, 1970.
See 90 S.Ct. 1259.

Phillip A. Barragate, Cleveland, Ohio, for appellants, Barragate & Barragate, Cleveland, Ohio, on brief.

Robert W. Jones, Cleveland, Ohio, for appellee, Robert B. Krupansky, U. S. Atty., Harry E. Pickering, Asst. U. S. Atty., Cleveland, Ohio, on brief.

Before PHILLIPS, Chief Judge, and EDWARDS and McCREE, Circuit Judges.

PHILLIPS, Chief Judge.

Defendants appeal from their convictions under 18 U.S.C. § 2113(a) (d) for armed robbery of a branch office of the Society National Bank of Cleveland, Ohio.

■ Two issues are raised by defendants on this appeal: (1) Whether the District Court improperly restricted defense counsel in the use of alleged Jencks Act statements in the cross-examination of government witnesses to the extent of depriving defendants of a fair trial; and (2) whether defendants were deprived of a fair trial by comments from the bench, interruptions by the District Judge and by his examination of witnesses during the course of the trial. Although not directly raised by defendants, this Court further has considered the threshold question of whether there is sufficient evidence in the record to sustain the jury's verdict of guilty.

In order to pass upon this issue, the entire transcript of the trial has been read and the exhibits have been examined.

### 1) Sufficiency of the Evidence

A jury verdict must be sustained if, taking the view of the evidence most favorable to the government, there is sufficient evidence to support it. Glasser v. United States, 315 U.S. 60, 81, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Shipp, 359 F.2d 185, 188 (6th Cir.).

At the outset we note that the first trial of this case ended with the jury unable to agree as to the guilt or innocence of the defendants. Hence we have scrutinized the evidence in the present case with an extra degree of care.

On the trial, which extended over a period of almost two weeks, the government introduced twelve witnesses in its case in chief and one witness in rebuttal. The defense presented seven witnesses. Defense counsel stipulated that a robbery had occurred and that some $27,000 was taken.

Mr. Williams, the bank custodian, testifying as a government witness, stated that on the day in question three men entered the Euclid-Green branch bank wearing stocking masks over their heads and faces. The first one to enter, Williams related, proceeded to the counter and vaulted over it. The second man stood near the counter, while the third kept bank personnel and customers under guard. He further testified that the first robber wore a long sleeved plaid flannel shirt, blue trousers and black shoes. He identified the shirt by saying, "I would swear this is the shirt that the fellow had on that came in here." The shirt was government exhibit 17. He also gave a general description of the two other men and identified several items, including shoes, hats and trousers, as being the type worn by the robbers. He also identified photographs of the robbery in progress taken by cameras activated by the alarm switch. He made an identification of one of the defendants as having a prominent nose like the one he observed protruding underneath the stocking mask worn by the robber who jumped over the counter.

The third government witness, a bank secretary, Mrs. Jamison, gave testimony which generally corroborated Mr. Williams. She agreed that the first robber wore dark trousers, but remembered them as being green. Further she recalled that this robber had a sharp profile with a protruding nose.

Three other bank employee witnesses provided generally corroborative testimony. The first government witness had testified that shortly after the robbery was under way one of the bank employees activated the alarm system which set in motion a signaling process which included a signal to the police department. She testified that the robbery was in progress for about one minute from approximately 10:30 or 10:35 a. m.

Officer Lloyd provided a major link in the chain of evidence connecting these defendants with the robbery. Lloyd testified that he was a police officer em-

ployed by the City of East Cleveland and was on duty the morning of the robbery. He related that about 10:30 a. m. he received over his police radio a broadcast to the effect that a robbery had occurred at the Euclid-Green branch bank, located on Euclid Avenue. According to his testimony the broadcast was a "standby call" and he proceeded slowly up Euclid Avenue in the direction of the bank, driving an unmarked detective cruiser. At that point he heard a second broadcast which told the direction the robbers were believed to be traveling and he turned in that direction onto Belvoir Boulevard. This was away from the general direction of the bank. Officer Lloyd testified that he was wearing civilian clothes and was not wearing a hat. As the officer proceeded along Belvoir at about twenty miles per hour in light traffic he said he noticed another car approaching him and that as it passed he recognized one of the occupants as the defendant John Delzoppo. As the car proceeded away from him he watched it in his rear view mirror and observed a "bundle" thrown from the passenger side of the automobile. He immediately turned around and drove back to the spot where the "bundle" had fallen and observed that it was clothing. He continued in pursuit of the automobile, overtook it in a short distance and stopped it, arresting the driver, Alfred Calabrese, and the passenger, John Delzoppo, on suspicion of robbery. Other officers arrived at the scene to assist. Officer Lloyd then returned to pick up the "bundle," and according to his testimony, the "bundle" consisted of a pair of trousers and a shirt. The shirt was identified by the officer as government exhibit 17.

Other testimony by government witnesses was inconclusive but was not inconsistent with the evidence implicating the defendants. Agent Jennett of the FBI testified that hair found in certain stockings discovered near the scene of the bank did not match samples of hair furnished to him as having come from the defendants.

The defendants did not take the stand in their own behalf. Through other witnesses they introduced testimony which tended to contradict government testimony: that certain of the items of clothes in evidence were too large to have been worn by either of the defendants; that the defendants were arrested at a place they could not have reached in the time that had elapsed after the robbery; that neither defendant was ever connected with the getaway car; that the loot was never recovered; and that no weapons or other contraband were shown to have been connected with the defendants.

The government rebuttal witness testified that on the basis of tests that he conducted, defendants would have had time to have disposed of the loot, changed clothes and driven to the point where they were arrested after the robbery.

Some of the evidence introduced by defendants tended to exculpate them. Part of the defense evidence was not necessarily inconsistent with the charges. We conclude that the defense evidence would not have prevented a finding of guilty beyond a reasonable doubt, determination of credibility being the province of the jury.

We cannot say, on this record, that there is not sufficient evidence to support the verdict.

### 2) The Jencks Act Question

Defendants claim that certain statements made by government witnesses to FBI agents regarding the events of the robbery are within the Jencks Act, 18 U.S.C. § 3500. The trial court ultimately concluded, pursuant to a government admission, that the statements were within the scope of the Jencks Act. We assume for purposes of this opinion that these are Jencks Act statements. Defendants further claim that the trial court unduly restricted the cross-examination of the government witnesses through use of these statements.

■■ We have found no case delineating with precision the permissible way

to cross examine witnesses through the use of Jencks Act statements. It was said by the Supreme Court that: "The statute governs the production of documents; it does not purport to affect or modify the rules of evidence regarding admissibility and use of statements once produced." Palermo v. United States, 360 U.S. 343, 354, 79 S.Ct. 1217, 1225, 3 L.Ed. 2d 1287. One of the main purposes of the Act is to permit defense counsel to use the statements for impeachment purposes. Palermo v. United States, *supra;* United States v. Wenzel, 311 F.2d 164, 171 (4th Cir.). The statute does not attempt, however, to set out rules governing the conduct of trials. We see no reason to conclude that Congress by this statute intended to restrict the trial judge's management of the courtroom, or to invade the functions of the District Judge with respect to the examination of witnesses and the manner of impeachment. It obviously would have been futile for Congress to have undertaken to anticipate the many courtroom situations in which this problem could arise. Therefore, the Supreme Court's observation as to another question under the act is applicable here. "Final decision * * must rest, as it does so very often in procedural and evidentiary matters, within the good sense and experience of the district judge * * *." Palermo v. United States, *supra,* 360 U.S. 343, 353, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287. Rigid rules cannot provide a practical solution to the problem at hand. On an examination of the record we determine whether all cross-examination was forbidden, and, if not, whether the opportunity which remained permitted or would have permitted the full development of evidence and an adequate exposure of inconsistencies. Where there was otherwise no abuse of discretion or prejudice, if a fair opportunity to cross-examine and impeach remained, the District Court's determination must stand. See Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680; Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624; Howard v.

United States, 128 U.S.App.D.C. 336, 389 F.2d 287, 292; Foster v. United States, 282 F.2d 222, 224 (10th Cir.); Robles v. United States, 279 F.2d 401, 405 (9th Cir.), cert. denied, 365 U.S. 836, 81 S.Ct. 750, 5 L.Ed.2d 745.

The record shows that the statements in question were furnished by the government to defense counsel well in advance of the examination of the witnesses sought to be cross-examined. The record further discloses that, even before the District Court ruled that the statements were within the scope of the Jencks Act, cross-examination and impeachment were not prevented. The District Court merely disapproved of the method that was being employed by defense counsel. The following colloquy took place between the Court and defense counsel:

"MR. PHILLIP C. BARRAGATE: No, your Honor; I assumed that they were given to us in accordance with the law under the Jenks [sic] Act. And if they were not given to us for that purpose, I would like to have the Court's ruling on that question, because I want to clearly understand this Court * * *. If the Court is going to tell me that I cannot use these statements in cross examination, I assure your Honor that I will take my exceptions for the record but I will not use those statements under any circumstances.

"THE COURT: I am not saying that, Mr. Barragate, that you cannot—the information that is contained in those statements is available to you. All right? You may use that information as best you can with regard to the conduct of your case, but you cannot cross examine a witness with that statement as though this was a statement she gave under the Jenks [sic] Act.

"Now, the Court sees nothing wrong or improper, if there are variances between what you read in that statement and what the witness is saying

from the stand, the Court sees nothing improper with your asking the witness, 'Did you state to Agent So-and-so of the FBI that the first bank robber wore gray trousers?' There is nothing wrong with that, but I do see something wrong with your holding it up and reading it as though that were her statement, because until you put the agent on, this witness already having denied or having admitted of no knowledge with regard to the statement you are reading from, she certainly cannot be cross examined with regard to it.

"MR. PHILLIP C. BARRAGATE: For the sake of clarity, so I understand the Court and so that I do not offend the Court, may I ask a witness who has made a statement, first, whether or not she talked to the agent and, secondly—

"THE COURT: Oh, sure.

"MR. PHILLIP C. BARRAGATE: —if she talked to the agent, in the course of the conversation did she say thus and so to the agent? That is all I have been doing all the time, that is all I am trying to do, so that if she denies it or doesn't recall it, we call in the agent and say, 'Did you investigate this matter? Did you talk to this witness? Did this witness say thus and so to you or not?'

"That is all I am trying to get, and I don't want to use it for any other purpose except that. Now, if it is all right with the Court that we do that, that is what I will do. And if the Court doesn't want us to do that, let me assure your Honor that I am not going to do it."

The initial ruling of the District Court came at a point on the third day of the trial when the bank employee witnesses were testifying. This was on Thursday, October 3. The next session was held on the following Monday. Before the first witness was called on this day it was stated that the government had admitted that the statements in controversy were within the Jencks Act. The Court made an offer to defense counsel to recall any of the witnesses for further cross-examination in light of the court's ruling that, pursuant to the government's admission, the statements would be regarded as Jencks Act statements. Furthermore, the statements themselves were introduced into evidence as joint exhibits. At this time it appeared that defense counsel would recall some witnesses. Counsel informed the Court as follows:

"MR. PHILLIP C. BARRAGATE: Your Honor, before we get to that particular stipulation, I want to say to your Honor that, with respect to recalling certain witnesses now that we do have the statements in evidence, we will let your Honor know some time before the day is out which of the witnesses we would like to recall."

On Tuesday counsel stated that he did not desire to take the opportunity to recall because he felt that further cross-examination would not remove the prejudice already created. He moved for a mistrial. Although denying the motion, the Court prepared and gave a comprehensive instruction to the jury as to the matters defense counsel has raised concerning the confusion about the statements.

Although the District Court initially limited to some extent the use of the statements on cross-examination, we hold on a review of the entire record that the limitation was not so severe as to constitute an abuse of discretion. This is not a case where cross-examination was forbidden or terminated. The type of questions to be asked and the manner of asking them is the gravamen of the controversy. These matters are those peculiarly within the trial court's sound discretion and his broad province to control courtroom conduct. Foster v. United States, *supra*; Robles v. United States, *supra*; Roseman v. United States, 364 F.2d 18, 27, 22 A.L.R.3d 1308 (9th Cir.), *cert. denied*, 386 U.S. 918, 87 S.Ct. 879, 17 L.Ed.2d 789. See also, Darby v. United States, 283 F.2d 896 (10th Cir.).

It has not been shown that any substantial rights of defendants were prejudiced. Even if some prejudice might have occurred at the time of the initial ruling by the District Court, we think the subsequent opportunity presented by the District Judge to recall and cross-examine the witnesses after the ruling as to the Jencks Act character of the statements, in conjunction with the Court's instruction to the jury, was all that was necessary under the facts of this case.

3) Comments, Interruptions and Questioning of Witnesses by District Judge

■ The record discloses that on a number of occasions the District Judge interrupted attorneys for both parties in the course of direct examination or cross-examination and interrogated witnesses from the bench. This Court previously has expressed the view that this "is not to be commended as a desirable practice." United States v. Lewis, 338 F.2d 137, 141 (6th Cir.), cert. denied, 380 U.S. 978, 85 S.Ct. 1342, 14 L.Ed.2d 272. In United States v. Carabbia, 381 F.2d 133, 139 (6th Cir.), cert. denied, 389 U.S. 1007, 88 S.Ct. 564, 19 L.Ed.2d 602, this Court, speaking through Judge Cecil, said: "We do not look with favor on extensive examination of witnesses by the trial judge in a jury trial." We do not find, however, that the interruptions and questioning by the District Judge, or his comments from the bench in the present case, "take him outside the limits of permissibility as outlined in Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321." United States v. Vida, 370 F.2d 759, 768 (6th Cir.), cert. denied, 387 U.S. 910, 87 S.Ct. 1695, 18 L.Ed.2d 630. The District Judge explicitly instructed the jury that no inferences were to be drawn by his questions or comments.

We conclude that the interruptions, comments and questioning of witnesses, although regrettable, did not deprive defendants of a fair trial, viewing the record in its entirety.

Affirmed.