OPINION OF THE COURT
James G. Starkey, J.
Defendant has moved pursuant to CPL 440.10 (1) (f) and (h) for an order vacating his convictions of kidnapping in the second degree and assault in the second degree. The question presented is whether the failure by the prosecution during the trial to make delivery to defense counsel of a one paragraph summary of the evidence in a police department report — the existence of which was unknown to the prosecution — requires a new trial, even when it is clear that the absence of the report did not affect the outcome of the trial.
THE FACTS
On February 22, 1988 defendant attacked his estranged wife, Lydia Machado, and forced her into a van on Jefferson Avenue in Brooklyn. He then drove off while his wife’s brother, a man named Morales, clung to the side of the van in an attempt to help his sister. In an apparent attempt to dislodge Mr. Morales, defendant turned sharply and erratically as he drove down the street and Mr. Morales was in fact thrown off. He struck a street sign and died of the injuries received. Defendant left the scene — and New York State — in the van and terrorized Lydia Machado, with physical abuse and threats to kill her, until his apprehension back in Brooklyn IV2 hours later. Detective Michael Russell of the 83rd Detective Squad was named the arresting officer, although he had not actually participated in defendant’s apprehension or witnessed any of the events leading up to it.
In due course, defendant was charged with various crimes including murder, kidnapping and assault. At the trial, Detective Russell testified, but his testimony was limited to the fact that the defendant had not been a problem while in custody, the accuracy of photographs depicting the crime scene and a search several days later of the van used by defendant. Mrs. Machado also testified, but did not mention any medical treatment until cross-examination. At that time, defense counsel asked several questions which — apparently because the *96 medical records were available in court — correctly assumed that she had received medical treatment.
On January 4, 1990 defendant was acquitted by a jury of murder, but convicted of the kidnapping and assault charges. He was sentenced to 8 Vs to 25 years and 2 Vs to 7 years, respectively, the sentences to run concurrently.
UNDELIVERED POLICE REPORT
In August 1990 (approximately eight months after the trial) the prosecution informed counsel for the defendant that a report prepared by Detective Russell — one which had not been previously delivered to defense counsel — had come to light. The document, entitled "Brooklyn Detective Area Confidential Report”, stated that it was not an official police department form — that it existed as a means to transmit theories, opinions and other confidential information to designated superiors. Instead of noting theories, opinions or other confidential information, however, Detective Russell had entered on the form a one paragraph synopsis, information received from various sources, reading as follows: "On 2/22/88 at approximately 0900 hrs William Machado forced his wife Lydia Machado into a van at knifepoint. Machado and his wife were scheduled to appear at Brooklyn Criminal court this date on a complaint of Menacing filed by Lydia. Machado was waiting for his wife and when he forced her into the Van, Eddie Morales (Lydia’s Brother) attempted to assist her and as the van was moving he was dragged in excess of 300’ sustaining injuries. Morales was removed to Woodhull Hospital and expired thereat. Machado drove with his wife to Connecticut and while enroute did menace and cut her on the neck with a knife. He then drove back to New York and was observed by the Aviation unit in Forest Park. A Highway unit was alerted and the van was subsequently stopped and Machado placed under arrest. Mrs Machado sustained minor injuries and refused Medical aid.”
Except for the last sentence of the paragraph, the information described was acquired by Detective Russell from various police officers who had participated in the investigation. He had also spoken to one or two civilian witnesses who testified at the trial, but no material was attributable to any particular witness, police officer or civilian. The last sentence — stating that Mrs. Machado had "refused Medical aid” — was a somewhat distorted characterization of information also received *97 from other police officers and from a direct exchange between Detective Russell and Mrs. Machado. The direct exchange apparently followed similar ones with the other officers and occurred as a prelude to interrogation of Mrs. Machado. Detective Russell asked her if she could discuss her ordeal or wanted to go to a hospital immediately. When Mrs. Machado stated, in essence, that she would talk first and go to the hospital later, he noted that she had "refused Medical aid”— in accordance with a defensive police department procedure employed when people decline immediate medical help while under the protection of the police department. As noted above, defense counsel elicited on cross-examination that she had in fact received medical assistance at a hospital after the conclusion of her interview with Detective Russell.
When counsel for defendant was apprised of Detective Russell’s report in August 1990, a notice of appeal from the kidnapping and assault convictions had been filed, but the brief had not yet been completed. Counsel for defendant then completed the brief and filed it on February 2, 1992, including a contention that the failure to deliver Detective Russell’s report constituted a Rosario violation — a failure to make timely delivery of a witness’s previous statement for use in cross-examining the witness at trial — even though there was no record before the court relating to the violation claimed.[1]
On October 9, 1992, to remedy the defect, counsel moved to enlarge the record on appeal to include Detective Russell’s report. The Appellate Division, however, denied the motion on October 30, 1992, relegating defendant to a motion pursuant to CPL 440.10. Defendant then filed and served that motion— the subject of this decision — on November 13, 1992. On January 15, 1993 a hearing on the motion was held during which Michael Russell and Lydia Machado testified.[2]
Meanwhile, on December 28, 1992, the kidnapping and assault convictions were affirmed by the Appellate Division. Then, on March 16, 1993, a motion for leave to appeal to the Court of Appeals was denied by Judge Bellacosa of that Court.
*98 THE LAW
The issue referred to above — whether a new trial is required because of the failure of the prosecution to deliver Detective Russell’s report to the defense at trial — is divisible into two parts.
First, does the one paragraph summary constitute what has been termed "Rosario material”? Second, if so, does the failure to deliver it require a new trial, ipso facto, or must the defendant demonstrate prejudice?
1. Whether the summary constitutes Rosario material.
Prior to People v Rosario (9 NY2d 286 [1961]), defense attorneys in New York were not entitled to receive from the prosecution previous statements of prosecution witnesses for use in cross-examination — even when such a statement directly related to the subject matter of a witness’s testimony on direct examination. Instead, a witness’s previous statement was delivered to the Trial Judge for inspection and only such parts of the statement as — in the opinion of the Judge — varied from the witness’s direct testimony were made available to defense counsel. (See, People v Rosario, supra, at 288-289; People v Bai, 7 NY2d 152, 155 [1959]; People v Dales, 309 NY 97, 103 [1955]; People v Schainuck, 286 NY 161 [1941]; People v Walsh, 262 NY 140, 149-150 [1933].)
The described procedure was not unique to New York. A similar practice prevailed in the Federal courts prior to the time the United States Supreme Court decided Jencks v United States (353 US 657, 669 [1957]). There the Supreme Court blazed the trail followed in the Rosario case, holding that a defendant "is entitled to inspect” any statement made by a prosecution witness which bears on the subject matter of the witness’s testimony. (See, Jencks v United States, supra, at 667-668; see also, People v Williams, 165 AD2d 839, 840 [2d Dept 1990].)
Soon thereafter, the holding of the Jencks case (supra) was refined and codified by the Congress. (See, 18 USC § 3500.)
The defendant contends that the synopsis in question constitutes Rosario material as to Detective Russell, Mrs. Machado and another witness who testified at the trial, a woman named Edith Pagan. It is asserted that the report is Rosario material as to (1) Edith Pagan, because Detective Russell interviewed her about the abduction of Mrs. Machado before writing the report, (2) Detective Russell, because he wrote a *99 report discussing the events underlying the charges and (3) Mrs. Machado, because Detective Russell referred to a declination by her of medical treatment in the report. The defendant’s contentions fall short of the mark, however, as to each witness.
In the first instance, the witness Edith Pagan is not quoted or referred to as a source of information in the report and the testimony of former Detective Russell at the hearing — which testimony was credited — made it clear that the report constituted a synopsis of information received from a number of undifferentiated sources. It is well settled that such a synopsis of evidence received from a number of sources and not attributable, in whole or in part, to any one source, does not constitute Rosario material as to a witness who did not write the report. (See, People v Miller, 183 AD2d 790, 791 [2d Dept 1992] [confidential report prepared by nonwitness police officer containing a narrative of the crime held not Rosario material when the document did not attribute the information to any witnesses, when the source could have been other police officers and when it constituted a synopsis written after all interviews had been conducted]; People v Mills, 142 AD2d 653, 654 [2d Dept 1988] [synopsis of factual details of crime, written by prosecutor after several interviews and without attributing the information to any specific individual, held not Rosario material]; see also, People v Williams, 165 AD2d 839 [2d Dept 1990], supra [coded "Sprint” record, based on information received from Transit Police which was based, in turn, on complaint of token booth clerk, not Rosario material as to clerk].)
As to Detective Russell, it is true that he wrote the report and testified as a witness at the trial. The difficulty lies with the content of his testimony as compared to the definition of Rosario material. That definition includes a prior statement which "relates to the subject matter of the witness’ testimony”. (See, People v Rosario, 9 NY2d 286, 289 [1961].) As noted above, however, the report — except for the direct exchange with Lydia Machado concerning medical aid — constituted a synopsis of evidence received from a number of sources and not attributable, in whole or in part, to any one source. More important, neither the hearsay information concerning the events leading up to and constituting the crimes charged nor the exchange with Lydia Machado concerning medical aid related to the subject matter of Detective Russell’s testimony at the trial. That testimony, as also previously *100 noted, was devoted entirely to the defendant’s conduct while in custody, the accuracy of photographs depicting the crime scene and a search several days later of the van used by the defendant. By no stretch of the imagination, then, could any part of the report be characterized as "a statement by [the witness] reflecting the activities about which he testified at trial.” (People v Banch, 80 NY2d 610, 620 [1992]; see also, People v Goldman, 175 AD2d 723 [1st Dept 1991] [detective’s notes — concerning conversations with first police officer on the scene, other persons originally considered suspects, defendant’s prior indictment and things detective planned to do— held not Rosario material when detective testified only concerning technique used to record conversation to lay foundation for offer of recording as evidence]; People v Nixon, 166 AD2d 170 [1st Dept 1990] [police officer’s notes of an interview with a defense alibi witness held not to constitute Rosario material when they "did not directly relate to the subject matter of the officer’s direct testimony”]; People v Fridman, 162 AD2d 136 [1st Dept 1990] [taped conversations of prosecutor’s witnesses discussing tenant harrassment committed in other buildings for other landlords, held not Rosario material as to testimony concerning tenant harassment committed on behalf of defendants]; People v Veal, 158 AD2d 633 [2d Dept 1990] [reports concerning defendant as parolee held not Rosario material when former parole officer who prepared them testified only to defendant’s appearance at the time].)
People v Perez (65 NY2d 154 [1985]), relied on by the defendant, is distinguishable. There, recordings of conversations — in which relatives of defendant asked a witness not to testify and offered a bribe — were ruled Rosario material, even though the subject was not mentioned on direct examination. While noting that "not every statement made by a witness which reflects on his credibility should be viewed as relating to the subject matter of his testimony”, the Court ruled that these statements were "directly related to the witness’ trial testimony because it was that testimony which the bribe discussions were [designed] to affect”. (People v Perez, supra, at 159.) Here, nothing in the report related to Detective Russell’s testimony concerning his activities or to his credibility.
As to Mrs. Machado, it is true that in the report Detective Russell characterized a statement by her as one by which she had "refused Medical aid”. It is also settled that synopses of statements by a witness can constitute Rosario material. (See, People v Consolazio, 40 NY2d 446, 453 [1976] ["attorney’s *101 work product” claim disallowed as to prosecutor’s notes "capsulizing witnesses’ responses to questions” and notes held to constitute Rosario material].) But both logic and precedent make it clear that a synopsis or summary can deviate far enough from what was actually said so that it cannot be fairly characterized as a statement of the witness. The architects of the Federal standard felt it to be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness’ own rather than the product of the investigator’s selections, interpretations and interpolations”. (Palermo v United States, 360 US 343, 350 [1959] [600 word summary of statements made by witness during 3 Vi-hour interview held not subject to production as statement of witness]; see also, United States v Augenblick, 393 US 348, 354-355 [1969] [rough notes of witness interview held not subject to production as statement of witness]; United States v Gonzalez-Sanchez, 825 F2d 572, 586-587 [1st Cir 1987] [interviewer’s notes and summary of witness’ statements held not subject to production as statements of witness]; United States v Starusko, 729 F2d 256 [3d Cir 1984] [FBI reports summarizing and interpreting statements of witness held not subject to production as statement of witness]; United States v Hodges, 556 F2d 366 [5th Cir 1977] [reports concerning interviews with witnesses made from memory by FBI agents days after interviews held not subject to production as statement of witness].)[3]
The same standard evinced the concern "that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder’s opinions or impressions”. (Palermo v United States, supra, at 352.)
The term "refused Medical aid” as employed here was clearly off the mark. As noted above, the phrase omitted the context and significantly distorted what had occurred: a verbal exchange to the effect that medical aid would be sought later, rather than immediately. Such a distortion could hardly be *102 considered or fairly described as a statement of Mrs. Machado. (See, Palermo v United States, supra.)
In light of the above, therefore, it is concluded that the report did not constitute Rosario material as to any of the three witnesses in question. Moreover, even if it had, analysis of the second question — whether a party in the position of the defendant Machado must demonstrate prejudice to be entitled to relief — mandates the same result.
2. Whether the failure to deliver Rosario material requires a new trial, ipso facto, or must the defendant demonstrate prejudice?
When an undelivered report constitutes Rosario material, the answer to the above question — pursuant to various holdings of the Court of Appeals — would seem to depend upon how far an appeal from the original conviction has progressed when the motion based upon the Rosario violation is decided. It is settled that when a Rosario violation is established on direct appeal, defendant is entitled to a reversal and a new trial even if no prejudice can be demonstrated. (See, People v Consolazio, 40 NY2d 446, 454 [1976], supra.) The same rule has been applied when appeal of an order denying a motion pursuant to CPL 440.10 based upon a Rosario violation was combined with an appeal of the original conviction. (See, People v Jackson, 78 NY2d 638, 641 [1991], citing People v Novoa, 70 NY2d 490 [1987]; see also, People v Cecora, 186 AD2d 215 [2d Dept 1992].) But when the direct appellate process had been exhausted at the time the motion based upon the Rosario violation was commenced, it was held that no relief would be available in the absence of a showing of "a reasonable possibility that the failure to disclose the Rosario material contributed to the verdict”. (See, People v Jackson, supra, at 649.)
The rule applicable between the two extremes, and to this case in particular, is less clear. But Judge Titone, who vigorously dissented in the Jackson case (supra), has interpreted that case as requiring a showing of prejudice where, as here, the conviction has been affirmed by the Appellate Division prior to a determination of the CPL 440.10 motion. As to the holding in the Jackson case, he asserted that: "It is arbitrary because it makes the availability of the per se reversal rule turn on the fortuity of whether the undisclosed Rosario material is discovered before or after the intermediate appellate *103 court has heard and determined the direct appeal.[4]” (People v Jackson, supra, at 657-658.)
Then, in the footnote, he observed that: "4. Even where the Rosario material has been discovered before disposition of the direct appeal, there remains the possibility that the direct appeal will be determined before the CPL 440.10 motion based on the Rosario violation can be heard and determined. While the defendant in such situations can seek to have the disposition of the direct appeal held in abeyance, it seems capricious and unfair to make the availability of a more favorable standard of review turn upon the defendant’s success in navigating such a series of procedural hurdles.” (People v Jackson, supra, at 658, n 4.)
Judge Titone’s interpretation of the Jackson case (supra)— albeit a disapproving one — is adopted as a correct statement of the law.
Thus even if the report in question were to have constituted Rosario material, a showing of prejudice — a showing of a reasonable possibility that the failure to deliver the report contributed to the verdict — would be necessary. (People v Jackson, supra, at 649.) The defendant has failed to make such a showing.
Since Detective Russell was not a witness to the crimes, his testimony at the trial was peripheral and did not relate at all to the conduct which gave rise to the charges. As noted above, it was limited to uncontroversial matters — including the fact that defendant had not been a difficult prisoner, the accuracy of crime scene photographs and a search of the van used by defendant. Nothing in the report related to the testimony he gave or could conceivably have been used to attack his credibility.
Similarly, as to the testimony of Mrs. Machado, the fact that she had in fact received treatment at a hospital and the nature of her injuries were elicited on cross-examination and substantially undisputed. It was never suggested that her injuries were serious or required hospital confinement. Indeed, according to her testimony, the treatment she received did not go much beyond the delivery to her of either some pills or a prescription for pills.
Evidence that medical treatment was not thought a top priority or had even been "refused” in the first instance would have been unremarkable in the circumstances. It therefore borders on the inconceivable that the failure to produce the *104 report contributed to the verdict. (See, People v Jackson, 78 NY2d 638, 649 [1991].)[4]
In light of the above, defendant’s motion to vacate his conviction must be denied.

. The prosecution served and filed its brief in response on September 21, 1992.

. It was then that Mr. Russell, now retired from the police department, explained that, except for the last sentence, the synopsis was not based on information from any particular source — but rather from a combination of sources — and that the "refused Medical aid” comment had distorted the true nature of the exchange.

. It has been said that the Consolazio case (supra) stands for the proposition that "any notes on any interview with a witness, no matter what the form and no matter when made” are Rosario material. (See, People v Cavallerio, 71 AD2d 338, 344 [1st Dept 1979].) But scrutiny of the authorities cited above and the Consolazio case (which held that the synopsis in question there constituted Rosario material, not that all synopses do) suggests that the statement goes too far.

. It is also worthy of note that any faint possibility that it contributed to the verdict would be limited to the conviction of assault. It is difficult to conceive of a way in which it could have contributed to the conviction of the more serious charge, kidnapping in the second degree.