Willie Frank FOSTER, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16991.

United States Court of Appeals
Eighth Circuit.

Oct. 19, 1962.

Keith Mattern, St. Louis, Mo., for appellant.

William S. Martin, Asst. U. S. Atty., St. Louis, Mo., for appellee. D. Jeff Lance, U. S. Atty., on the brief.

Before VOGEL and VAN OOSTERHOUT, Circuit Judges, and VAN PELT, District Judge.

VOGEL, Circuit Judge.

Willie Frank Foster, who will hereinafter be referred to as the defendant, was charged by grand jury indictment in six counts with narcotic violations of 26 U.S.C.A. § 4705(a) and 21 U.S.C.A. § 174. He was originally brought to trial before a jury on October 18, 1961. During the cross-examination of the first government witness, one Oscar Hatcher,

Hatcher reversed his testimony. On defendant's motion, a mistrial was declared. Hatcher was summarily found guilty of contempt of court and sentenced to six months' confinement. Defendant was charged under 18 U.S.C.A. § 1503 with intimidating a witness. On December 11 and 12, 1961, he was tried on the latter charge and acquitted by a jury. On January 22, 1962, there began the retrial of the defendant on the original charges. By jury verdict returned on January 24, 1962, defendant was found guilty on all six counts. He was sentenced to confinement for a period of twelve years. He appeals to this court from the judgment of conviction. Defendant lists what he claims to be errors on the part of the trial court as follows:

1. "The Court erred in refusing to allow defense to explain the charge and verdict in the case of United States vs. Willie Frank Foster, 61 Cr. 283(2) in Defense's opening statement." [Defendant is referring to the intimidation case resulting in defendant's acquittal.]

2. "The Court erred in refusing to allow defense an inspection of all pertinent portions of the file prepared by Agent Hall and used by the government in the trial."

3. "The Court erred in refusing to instruct the Jury in the matters contained in defendant's requested instruction No. 2."

We consider the first claimed error. Upon the commencement of the case, the government prosecutor opened his voir dire examination of the jury panel with a brief statement by way of background. He concluded it by saying:

" * * * Now, this is a narcotic case, and incidentally, this case was in court once before, and I would like to inquire, is there anyone on this panel that was on the panel when the case was in court once before? If so, would you indicate it by raising your hand. I don't have that jury list, and I don't recall everybody that was there."

Subsequently, counsel for the defendant stated to the jury:

"Mr. Mattern: Mr. Martin has asked you if there were any of you who were on the panel at the prior trial of this same case. Are there any of you who have knowledge of that prior trial, or any of you that have knowledge of the case of the U. S. vs. Willie Foster?"

After the selection and swearing in of the jury, government counsel made his opening statement detailing the six charges against the defendant, the defendant's plea of not guilty and gave an outline of what the government's evidence would be. No reference was made therein to the defendant's trial on the intimidation charge. Defendant's counsel in his opening statement, however, attempted to tell the jury about the intimidation trial and defendant's acquittal therein. The government objected. The following transpired out of the presence of the jury:

"The Court: Well, but you can do that when it comes to examining these witnesses, but to make those things in this opening statement— what do you intend to say?

"Mr. Mattern: I intend to say that the case was originally tried; that the government brought forth a paid informer, or informer, who reversed himself on the stand; a mistrial was declared, and my man was charged with intimidating the witness. My man was then found innocent of intimidation, and the original case is being tried here again today. I think they're entitled to know that nothing has changed from the opening of court at the original trial. Now, the jurors are under the impression that there have been cases gone on before in this trial, and I think they're entitled to know that my man—that the trials have either been declared mistrials or he's been found innocent of everything, and he's as free as one of us being tried. Of course I think they now have the impression that there

have been several trials in here, and there's going to be created in their mind the idea that if they're bringing this many cases against him, they must have something.

"The Court: Well, I don't like to try a lawsuit this way, but if you referred to that other—as you said you did—I didn't recall it to be quite that extensive, but if you did refer to some former case, why I suppose probably he's entitled to show it."

[Government prosecutor had not referred to the intimidation case but only to " * * * incidentally, this case was in court once before."]

Counsel for the defendant still persisted.

"Mr. Mattern: I realize that, your Honor, but I still think that the jury should know that my man was indicted for the tampering with the witness in the first trial that caused the mistrial, and my man was found innocent of that, so they have to take this witness at face value rather than somebody who might still be under duress, for all the jury is going to know, because he's still going to say yes, but I said that because Foster told me to.

"The Court: Well, I think that better be left to see how the evidence develops, Mr. Mattern, and I'd prefer you leave that other matter out. I'll let you refer to this first trial which was declared a mistrial, but leave the other out until we see how things develop. I'm going to let you try everything that's fair to your client, I assure you, but I don't want this jury to be confused in trying this case by something that happened in some other case that has absolutely no bearing upon the issues in this case, except as there may be some impeachment."

■■ The only purpose of opening statements is to inform the jury what the case is about and to outline the proof that will be used—on the one hand to establish the commission of the crime and on the other to outline the defense —so that the jurors may more intelligently follow the testimony as it is related by the witnesses. Here government counsel had made no reference in his opening statement to the intimidation trial. Only on voir dire had he referred to the fact that "this case" had been in court once before. Under the circumstances, whether testimony regarding the intimidation trial would become pertinent for impeachment was entirely conjectural. We think the trial court acted within his discretion and free of prejudice in refusing to allow defense counsel to go into the details of the intimidation trial in his opening statement and in directing that he "leave the other out until we see how things develop". Counsel for the defendant was, in the remainder of his opening statement to the jury, allowed to inform them as follows:

" * * * This is the second time that Willie Foster has been tried for these three acts that Mr. Martin has outlined to you. The prior trial, back in October, it started about October 17th, the trial commenced, and the government's witness, Oscar Hatcher, who Mr. Martin has made mention of, started to testify. Halfway through the cross-examination, or partially through; at least the cross-examination was started, Judge Weber, who is now deceased, stopped the trial and declared a mistrial. This is now a retrial of that first case, so when Mr. Martin refers to Mr. Foster being in court before on a narcotics charge, it's not another narcotics charge, it's the same one."

We think, additionally, that there is here much ado about nothing because later in the trial at the cross-examination of the witness Oscar Hatcher, defendant's counsel was allowed to bring out everything he wanted to include in his opening statement with reference to the intimidation trial of the defendant, Willie Frank Foster, and the fact that he was tried and acquitted of the alleged

threats. Accordingly, if there could possibly have been error, and we feel certain there was not, it was completely healed by the subsequent disclosures.

Defendant's second alleged error is based upon the court's refusal "to allow defense an inspection of all pertinent portions of the file prepared by Agent Hall", apparently meaning a large investigation file used by government counsel during the trial and described by the trial judge as "a file which would be at least one inch thick of papers". Federal Bureau of Narcotics Agent Ernest H. Hall had testified for the prosecution with reference to two of the three purchases made by the witness Oscar Hatcher, who had preceded him on the stand. Defendant's attorney began his cross-examination of Hall as follows:

"Q. Agent Hall, have you made a written report of this case to the government?

"A. Yes, sir.

"Q. Have you given this report to the government?

"A. Yes, sir.

"Q. Was this report prepared in your office subsequent to your investigation?

"A. Yes, it was.

"Q. Is the testimony that you have given here today substantially the same as it appears in that report?

"A. To the best of my knowledge, yes, sir.

"Mr. Mattern: Your Honor, I move at this time for inspection of this report, for use in cross-examination for impeachment purposes.

"The Court: If you have such a statement, you may produce it, Mr. Martin.

"Mr. Martin: Mr. Hall, will you find it in there, please, sir?

"Witness: Do you want those as to each separate transaction?

"Mr. Mattern: I'd like the written report that you have given to the government.

"Witness: You mean to Mr. Martin's office?

"Mr. Mattern: Yes, sir."

An 8-page typewritten report signed by Agent Hall was given to defendant's counsel. Defendant's counsel was not satisfied. Apparently referring to the thick investigation file, he appealed to the court as follows:

"Mr. Mattern: Your Honor, I've noticed that the United States Attorney has been looking at this document (indicating) the whole time. I think under the provisions of what's commonly referred to as the Jenks [sic] Act, I'm entitled to have the Court examine that to see if there isn't pertinent testimony in it."

Without at any time being specific, defendant's counsel continued to demand the entire file, that it be made available to him or that the court examine it. This was denied. In addition to Hall's signed report, however, he was given, on demand, three signed statements from the file, made by the witness Oscar Hatcher, although at that time Hatcher had already testified, been cross-examined and excused.

Counsel for defendant relies on Holmes v. United States, 4 Cir., 1959, 271 F.2d 635, 638, and in this court he argues:

"Here, it is obvious that all of the statements and notes contained in Agent Hall's thick file was information that he, Agent Hall, had actually obtained during the course of his investigation and should be considered a 'statement' within the meaning of the Act."

At no time does counsel for the defendant make it clear exactly what he is asking for excepting only that he was demanding the government's entire file so that he could see whether it contained anything helpful to him or not. He stated to the trial court:

"Mr. Mattern: Yes, he has presented me with an eight page typewritten report submitted by Agent Hall.

"The Court: To the United States Attorney's office; right? Is that right?

"Mr. Martin: Yes, your Honor.

"The Court: Isn't that what you asked for?

"Mr. Mattern: I asked Agent Hall—

"The Court (Interrupting) Isn't that what you asked for? Didn't you ask the Court and the United States Attorney to furnish you with a copy of that report?

"Mr. Mattern: No, sir. I asked for a copy of any report that he furnished to the government, and I saw them sitting here with a file about this thick (indicating) that he would keep refreshing Mr. Martin's memory from, and I wanted to see that file. This little typewritten thing is nothing more than what he testified to. I want to know the background of how they found Oscar Hatcher, how he came to work for them, and I have not been presented that. And my only motion before the Court at this time—I admit he gave me the report; I looked at it; I thanked him for it."

At this stage in the trial, Hatcher and Hall were the only government witnesses who had testified and, as stated, defense counsel had received Hall's 8-page signed report and three statements signed by Hatcher referred to in Hall's report. There may have been, and very probably were other statements contained in the Narcotics Agent's investigation file to which counsel would have been entitled upon proper and timely request. It is, however, incumbent upon the defense to be definitive in their request, at least to the extent of limiting their demands to "statements" before there is any duty on the prosecution or the court to seek out and produce such material.

[3–5] Under 18 U.S.C.A. § 3500 the defendant is entitled, *"After a witness called by the United States has testified on direct examination, * * *"* (emphasis supplied) to any written statement " * * * signed or otherwise adopted or approved by him" which is in the possession of the government and which relates to the subject matter as to which the witness has testified. The purpose is impeachment only. The Act is one of limitation. It circumscribes what may be obtained and the purpose for which it may be used. Its adoption by Congress followed the Supreme Court case of Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, and it, rather than the opinion of the Supreme Court in Jencks, measures the right to obtain statements or reports in the possession of the United States and the procedure to be used in obtaining them. See United States v. Killian, 7 Cir., 1960, 275 F.2d 561, 568–570. Following the adoption of the Act, the Supreme Court, in Palermo v. United States, 1959, 360 U.S. 343, 351, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287, stated:

" * * * The purpose of the Act, its fair reading and its overwhelming legislative history compel us to hold that statements of a government witness made to an agent of the Government which cannot be produced under the terms of 18 U.S.C. § 3500 cannot be produced at all."

Here it became perfectly apparent that counsel was demanding and would be satisfied with nothing less than the government's entire file—this without foundation or inference other than counsel's present *ipse dixit*, appearing in his brief in this court, to the effect that the entire file was Agent Hall's statement. This was nothing more or less than a desire to go upon a " * * * broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up", as referred to by the Supreme Court in Gordon v. United States, 1953, 344 U.S. 414, 419, 73 S.Ct. 369, 373, 97 L.Ed. 447, and Jencks v. United States, supra, at pages 666–667 of 353 U.S., 77 S.Ct. 1007. There is nothing in § 3500 or in the cases construing its application which justifies the conclusion that the

government can be forced to produce its entire files for inspection by defendant's counsel or by the court in order to determine if it contains some pertinent matter which might be of assistance to the defense. See United States v. Killian, supra; Johnson v. United States, 10 Cir., 1959, 269 F.2d 72, 74; United States v. Kelly, 10 Cir., 1959, 269 F.2d 448, 452, certiorari denied, 362 U.S. 904, 80 S.Ct. 615, 4 L.Ed.2d 555; United States v. Soto, 7 Cir., 1958, 256 F.2d 729, 734.

We do not read Holmes v. United States, supra, upon which defendant relies as holding to the contrary. There the government had contended that the Jencks Act did not apply to statements prepared by a government agent even though he became a witness at the trial. That case is sound authority for the principle that production of memoranda and reports prepared by an agent, which reports and memoranda are the subject matter of his subsequent testimony, do come clearly within the Jencks Act and must be produced. That is not the situation here. We find no just grounds for complaint with reference to defendant's second claim of error.

Defendant's third claim of error dealt with the court's charge to the jury and its refusal to give defendant's requested instruction No. 2, which was as follows:

"That the correct procedure when an informer is used in a narcotics case is that the government should give the informer marked or otherwise identifiable money, the government should search the informer carefully before the informer leaves on his mission, make sure that the informer has no narcotics concealed on or about his person, the government should keep the informer in sight at all times so as to exclude the informer from having obtained narcotics elsewhere, and after arresting the suspect and finding the marked or otherwise identifiable money in the possession of the suspect, the informer should be searched and the narcotics seized, and if you find that this procedure was followed, then the defendant is guilty. However, if any one of these elements is missing, then the defendant must be found to be innocent."

Defendant relies upon Panci v. United States, 5 Cir., 1958, 256 F.2d 308, to support his contention that it was error to refuse to give the foregoing requested instruction. That case supports no such contention. Therein the court, in holding that the evidence did not justify a finding of guilt, stated, at page 312:

"The government *might have made out a case if,* in the ordinary way so often successfully used in informer type cases, the agents had given the informer marked or otherwise identified money, had searched him carefully before he left on his mission to insure that he had no narcotics concealed on or about him, had kept him in sight at all times so as to exclude his having obtained the narcotics elsewhere, and then made the arrest to find the identified money in the possession of the defendant and the narcotics in that of the informer. *Nothing of that kind was done here.* Instead the government brought and testified to its case with no more real support in the evidence for a finding of guilt than there was for the finding that a ghost had been seen in the story of the man who said, 'My friend saw a ghost eating off a plate at his house last night, and if you don't believe it, here is the plate he says he saw the ghost eating from'." (Emphasis supplied.)

The real basis of the Panci reversal is obviously grounded upon insufficiency of evidence. Their dictum as to how a case might have been made by the government is certainly not an attempt to establish an exclusive manner of proof in narcotics cases. Unlike Panci, we have here an abundance of evidence. On the date of each one of the purchases—June 2nd, June 5th and June 7th—the same procedure was followed.

Agents first searched the informer Hatcher and ascertained that he had no money and no narcotics on his person or in his possession. They then supplied him with money and sent him to the defendant's place of business. The informer was kept under complete surveillance all of the time by several agents until he had made the purchase and returned to the agents' automobile, where he was again searched, with the result that in each instance he then possessed no money but did possess the narcotics described in the various counts. There was no error in refusing to give the requested instruction.

We have examined the lengthy transcript of testimony and the instructions of the court to the jury, which we find to be clear, comprehensive and correct. The entire record impels the conclusion that the defendant's guilt was established beyond any reasonable doubt, that his rights were carefully protected throughout, and that his trial was eminently fair.

Affirmed.