**UBIOTICA CORPORATION, Petitioner,**

v.

**FOOD AND DRUG ADMINISTRATION,**
**Department of Health, Education**
**and Welfare,**
**and**
**Robert W. Finch, Secretary, Department**
**of Health, Education and Welfare,**
**Respondents.**

**No. 19876.**

United States Court of Appeals,
Sixth Circuit.

June 5, 1970.

Leo E. Rattay, Cleveland, Ohio, on brief for petitioner.

Howard S. Epstein, Atty., Dept. of Justice, Washington, D. C., for respondents; Will Wilson, Asst. Atty. Gen., Criminal Division, John L. Murphy, Chief, Administrative Regulations Section, U. S. Dept. of Justice, Washington, D. C., on the brief; William W. Goodrich, Asst. Gen. Counsel, Food, Drugs and Environmental Health Division, Eugene M. Ffeifer, Atty., U. S. Dept. of Health, Education and Welfare, Washington, D. C., of counsel.

Before EDWARDS, McCREE and COMBS, Circuit Judges.

COMBS, Circuit Judge.

This case is here on petition to review an order of the Commissioner of Food and Drugs refusing to approve a new drug application submitted by petitioner Ubiotica Corporation. The application was filed with the Commissioner pursuant to 21 U.S.C. § 355 which prohibits the introduction into interstate commerce of any new drug unless an application therefor has been submitted to and approved by the Commissioner. Petitioner had also filed with the Commissioner a Notice of Claimed Investigational Exemption pursuant to 21 U.S.C. § 355(i) which authorizes the promulgation of regulations for exempting from the new drug requirements drugs intended solely for investigational use by experts.

Petitioner originally filed its new drug application and claim for investigational exemption in June, 1963. The new drug is proposed for treatment of mongolism. It is denominated by the sponsor as "U" Series Drugs and consists of approximately fifty separate in-

gredients. For a number of years prior to the 1962 amendments to the Food and Drug Act, petitioner had administered the drug to patients under medical supervision.

In November, 1963, the Commissioner notified petitioner that, since certain conditions had not been met, the investigational exemption allowing clinical testing of the drug was terminated. Petitioner unsuccessfully sought to enjoin and vacate this order in Turkel v. Food and Drug Administration, 334 F.2d 844 (6th Cir. 1964). We held there that 21 U.S.C. § 355(h) does not permit review of the withdrawal of an investigational exemption except on appeal from a subsequent order of the Secretary refusing to approve a new drug application. However, prior to our decision in *Turkel,* petitioner withdrew the new drug application which it had submitted in June, 1963.

Then, in June, 1966, petitioner submitted a second new drug application which was designated as supplemental to the previously withdrawn new drug application. After extended correspondence, petitioner was notified that the Commissioner proposed to issue an order refusing approval of the new drug application. A hearing was held, and subsequently the order was issued which is the subject of this appeal. The record before us consists of numerous exhibits and in excess of 6,000 pages of transcript. On this appeal we are asked to review the Commissioner's action in refusing to approve the new drug application and also in terminating petitioner's investigational exemption. In addition, petitioner alleges that it was denied a fair hearing and that the hearing examiner erroneously refused to require the Food and Drug Administration to make available certain witnesses and to produce various documents.

*New Drug Application*—The statutory scheme pertaining to the submission and approval or rejection of new drug applications is embodied in 21 U.S.C. § 355. Section 355(b) sets forth the information which is required to be submitted as a part of any new drug application, whereas section 355(d) establishes the permissible grounds for rejection of a new drug application. This latter subsection requires the Secretary to refuse to approve a new drug application if he finds any of the following to exist:

(1) the investigations and reports required to be submitted do not include adequate tests by all methods reasonably applicable to show whether the drug is safe;

(2) the results of such tests show the drug is unsafe or do not show it is safe under the conditions prescribed in the proposed labeling;

(3) the methods used in, and the facilities and controls used for the manufacture and processing of the drug are inadequate to preserve its identity, strength, quality, and purity;

(4) there is insufficient information to determine whether the drug is safe; or

(5) there is a lack of substantial evidence that the drug will have the effect it purports to have.

■■■ In enacting section 355, Congress clearly placed on the applicant the burden of establishing that the drug proposed to be distributed in interstate commerce is both safe and effective for the intended use. See Turkel v. Food and Drug Administration, 334 F.2d 844, 845. Here, the hearing examiner properly phrased the issues in terms of the statutory grounds for rejection set forth in section 355(d), and the Government came forward with proof as to why petitioner had not satisfied the burden of proof required of a new drug applicant under section 355. The Commissioner adopted the findings of the hearing examiner and concluded that the new drug application should not be approved in that it was deficient in each of the five respects enumerated above under section 355(d). The question here is whether those findings are supported by substantial evidence. 21 U.S.C. § 355(h).

We conclude that they are and that the Commissioner properly refused to approve the new drug application. In light of the voluminous and complex nature of this record, we will only briefly summarize the salient features of the testimony adduced from the Commissioner's witnesses, all of whom are eminently well qualified in their particular realm of expertise.

Dr. Thomas Bumbalo conducted a "double blind" study on a group of children having mongolism, the results of which were published in the American Medical Association Journal. Dr. Bumbalo testified that the double blind study is the accepted procedure in evaluating any new drug. Under this technique, one-half of the group studied was given the "U" Series Drugs continually for a one year period while the other half (the control group) was given a placebo. The clinical investigators did not know which group was receiving the drug. Dr. Henry Turkel, developer of the new drug, was informed of the Bumbalo study and prescribed the dosage to be given and its duration. Numerous laboratory studies were performed both at the beginning and end of the study, including physical examinations and measurements, urinalysis, x-rays, and chromosome, psychometric and other tests. Dr. Bumbalo and his team concluded that, although no untoward effect or reaction was noted, there was neither physical nor mental progression during the one year period the "U" Series Drugs were administered. Although aware of the Bumbalo study, petitioner did not submit the results of that study with its new drug application.

Dr. John Nestor, a specialist in pediatric cardiology and treatment of mongoloids, evaluated the new drug application in terms of the case histories of patients who had received the "U" Series Drugs contained therein. Dr. Nestor testified that, in his opinion, the new drug application did not include full reports of adequate tests by all methods reasonably applicable to show safety and efficacy; that the clinical reports did not contain adequate detailed information as to each case treated including the age, sex, conditions treated, dosage, frequency of administration, duration, and results; and that there was insufficient clinical data to establish safety or effectiveness.

Specifically, Dr. Nestor testified that the new drug application did not contain an accepted protocol.[1] Dr. Nestor particularly emphasized that in many instances the conclusions drawn in the reports submitted were not substantiated by objective data. For example, there was no evidence of the performance of such laboratory tests as chromosome studies to determine if a patient in fact was a mongoloid; x-rays, electrocardiograms, fluoroscope studies, psychometric tests, and other studies were frequently omitted from the reports. Dr. Nestor also pointed to the fact that in other cases treatment with the "U" Series Drugs was discontinued without explanation. Moreover, the reports contained in the new drug application often failed to report any medication given prior to or in conjunction with the "U" Series Drugs. Lastly, in certain cases, no reason was given why the doses administered did not conform to the doses suggested in the proposed labeling.

Dr. Frances Kelsey, a pharmacologist, evaluated the animal studies submitted as a part of the new drug application. Based upon this evaluation, Dr. Kelsey testified that the information was too meager to permit any definite conclusion as to the safety or toxicity of the "U" Series Drugs in the rats and dogs tested; that at most the study only provided a rough screening or preliminary idea of toxicity, indicating the need for additional studies. In particular, Dr. Kelsey noted the absence of microscopic slides and detailed pathology reports; the small number of animals tested; the ab-

---

1. A protocol is a plan for the investigation of a new drug which outlines how the drug is to be used, the number of patients, the conditions under which the drug is to be given, the doses, and other relevant data.

sence of certain laboratory work and the fragmentary nature of other laboratory studies; and the failure to feed and properly follow the animals at different dose levels in order to demonstrate a range of toxicity. Dr. Kelsey also testified that the formulation used in the animal studies differed from the formulation contained in the new drug application, and that none of the animal studies utilized all the ingredients contained in the "U" Series Drugs as set forth in the new drug application. Lastly, Dr. Kelsey stated that the absorption of the "U" Series Drugs by the dogs which lived was unclear due to the frequent vomiting which occurred. It is noteworthy that Dr. Robert Turner, who conducted the animal studies for petitioner, candidly admitted the difficulties inherent in the study due to the vomiting which took place. Dr. Turner also testified that he could not state that the "U" Series Drugs would not produce a toxic effect in the dosage levels indicated.

Dr. Dennis Kertesz, a chemist with the Bureau of Medicine of the Food and Drug Administration, testified that there was insufficient data supplied in the new drug application to establish that the manufacturing controls, methods, and facilities were adequate to preserve the identity, strength, quality, and purity of the "U" Series Drugs. Dr. Kertesz's testimony pointed out numerous deficiencies in this respect, which include: no full list of the articles used as components in the "U" Series Drugs; no list of all substances used in the synthesis of the new drug; no statement as to whether the ingredients are active or inactive; no statement of the composition of the capsule shell in which the drug is to be distributed; no batch formula representative of those to be employed in manufacturing the finished dosage form; no description of the facilities used in manufacturing and processing the "U" Series Drugs; no information pertaining to precautions to be taken to assure proper identity, strength, quality, and purity of the raw materials; no information as to the precautions uti-lized to check the actual package yield produced from a batch of the drug with the theoretical yield; no information pertaining to analytical controls used during the various stages of the manufacturing and labeling process; no complete description of data derived from studies of the stability of the drug; no data indicating an expiration date in order to preserve the identity, strength, quality, and purity of the drug; no data describing the methods used to permit determination of the distribution of any batch if recall were required; no representative samples of all tablets and capsule dosage forms listed in the labeling; an absence of detailed results of all laboratory tests made to determine the identity, strength, quality, and purity of the batch represented by the samples that were submitted; and the presence of ingredients in the "U" Series Drugs which were not listed in the United States Pharmacopoeia or the National Formulary. Dr. Kertesz also found that the samples provided by the sponsor weighed more than the sum of the weight of the ingredients listed on the proposed label.

*Investigational Exemption*—Petitioner contends that the Commissioner arbitrarily terminated its exemption from the new drug application requirements for the investigational use of the "U" Series Drugs. We noted in *Turkel v. Food and Drug Administration*, 334 F.2d 844, that the merits of the refusal of an investigational exemption "could be a proper issue at the New Drug Application hearing and thus be preserved for appellate review." Relying on this language in *Turkel*, the hearing examiner divided the subsequent hearing into two phases—one phase was devoted to a consideration of the refusal to approve the new drug application and the other to the termination of the investigational exemption. Following the hearing, the examiner concluded that the exemption had been properly terminated.

■ Our examination of the record convinces us that, on the basis of the material submitted in 1963 in support of

the claimed exemption, the Commissioner did not act arbitrarily in terminating the investigational exemption authorized by 21 U.S.C. § 355(i). The deficiencies brought out at the hearing include the following:

(1) the composition of a number of the ingredients in the "U" Series Drugs were not stated;

(2) certain components did not appear in the U. S. Pharmacopoeia, and no data was given as to the methods of synthesis used to prepare these unknowns;

(3) no data was presented relating to laboratory procedures or controls;

(4) no data was given as to the stability of the individual components of the drug;

(5) no labels were submitted;

(6) no information was supplied regarding raw material control data;

(7) no objective data was submitted to reflect pre-clinical investigations or clinical studies upon which the effect of the drug could be evaluated;

(8) no individual case histories in the form of objective data were presented; and

(9) no animal data was submitted. The Secretary is authorized by 21 U.S.C. § 355(i) to condition an investigational exemption upon the submission of reports of pre-clinical tests, including tests on animals, of the proposed drug adequate to justify any proposed clinical testing. Petitioner presented no evidence during the investigational exemption phase of the hearing.

*Production of Documents and Attendance of Witnesses*—During the course of the hearing, petitioner requested the hearing examiner to require the Food and Drug Administration to make available witnesses and to produce all statements, memoranda, records, notes, and work sheets contained in the Food and Drug Administration file concerning the "U" Series Drugs. These motions were denied although the Government did offer to make available certain witnesses requested by petitioner.

■ In attempting to regulate the interstate traffic in new drugs, Congress chose not to provide in 21 U.S.C. § 355 for subpoena power to compel the attendance of witnesses or the production of documents at the administrative hearing. We are unable to say that the absence of subpoena power renders section 355 unconstitutional under the due process clause. See Low Wah Suey v. Backus, 225 U.S. 460, 471, 32 S.Ct. 734, 56 L.Ed. 1165 (1912).

Petitioner also argues that the principle established in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), as codified in 18 U.S.C. § 3500, is applicable and required the production of the various documents requested. The *Jencks* case involved the right of an accused to have for purposes of impeachment documents prepared by a Government witness which formed the basis of the witness's testimony. The principle of *Jencks* has been applied under certain circumstances in administrative hearings to require the production of a prior statement made by a Government witness relating to his testimony. See N. L. R. B. v. Safway Steel Scaffolds Co., 383 F.2d 273 (5th Cir. 1967); Harvey Aluminum v. N. L. R. B., 335 F.2d 749 (9th Cir. 1964); Carlisle v. Rogers, 104 U.S.App.D.C. 307, 262 F.2d 19 (1958); Communist Party of U. S. v. Subversive Activities Control Board, 102 U.S.App.D.C. 395, 254 F.2d 314 (1958). On the other hand, the *Jencks* doctrine has not been extended to require the Government to produce an entire file; various reports and intra-agency communications of a federal agency have generally been regarded as free from disclosure. North American Airlines v. Civil Aeronautics Board, 100 U.S.App. D.C. 5, 240 F.2d 867 (1957); Appeal of the United States Securities Exchange Commission, 226 F.2d 501, 520 (6th Cir. 1955). See Foster v. United States, 308 F.2d 751 (8th Cir. 1962).

Petitioner moved under the guise of the *Jencks* doctrine to require the Government to produce all records, memoranda, and work products under the control of the Food and Drug Administration with respect to the "U" Series Drugs. The hearing examiner denied the motion after petitioner failed to specify those documents which it felt were producible with appropriate citations to the transcript of the hearing. Petitioner's demand was overly broad within the rationale of *Jencks* and was properly denied.

*Fair Hearing*—Petitioner maintains that it was denied a fair hearing in that the hearing examiner was biased and also because during the course of the hearing petitioner's counsel was excluded from further participation in the hearing. The exclusion of counsel occurred during the cross-examination of the Government's last witness. The hearing examiner noted that counsel's conduct had been "dilatory, recalcitrant, obstructive of orderly process, and contemptuous;" that counsel had deliberately refused to follow the directions of the Chair to the point that an orderly hearing was impossible. The findings of the hearing examiner to this effect is sustained by the record.

The hearing was then recessed to allow petitioner to obtain other counsel and to provide new counsel an opportunity to familiarize himself with the case. The record clearly reflects that, after the hearing was reconvened, petitioner was aggressively and diligently represented by new counsel. Moreover, although not allowed to actively participate further in the hearing, excluded counsel was permitted to remain at counsel table to advise and consult with active counsel.

Our review of this lengthy record convinces us that the exclusion of counsel from oral participation in the hearing was, under these circumstances, justified and that petitioner was in no other respect denied a fair hearing.

The petition is dismissed.