UNITED STATES of America,
Plaintiff,

v.

Blackburn JACKSON et al.,
Defendants.

No. 73 CR 193.

United States District Court,
N. D. Illinois, E. D.

April 18, 1974.

James R. Thompson, U. S. Atty., Mary L. Sfasciotti, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

Thomas H. Ramsey, Chicago, Ill., for Jackson.

Joseph A. Ettinger, Chicago, Ill., for Lloyd.

Stephen Levy, Chicago, Ill., for Priddy.

William P. Carroll, Chicago, Ill., for Williams.

Ronald R. Marich, Chicago, Ill., for Smith.

## MEMORANDUM OPINION

MARSHALL, District Judge.

On April 8, 1974, I entered a judgment dismissing the instant indictment as to the defendant Blackburn Jackson because of the Government's wilful refusal to comply with a pretrial order entered December 18, 1973 and for the additional reason that Jackson has been denied the speedy trial guaranteed him by the Sixth Amendment to the Constitution of the United States. Because the case involves important questions regarding the authority of district courts to engage in meaningful pretrial supervision of potentially lengthy or complex criminal cases, I write this opinion recognizing that post judgment explana-

tions are treacherous things.[1] In doing so, however, I wish to state that much of what is said here has been previously stated to counsel for the parties in the case (See, e. g., Tr. Pro. April 5, 1974.)

The history of the case and the circumstances attendant the entry of the pretrial order which the Government has refused to honor should be stated in full before addressing the issues involved.

## THE HISTORY OF THE CASE, THE ORDER OF DECEMBER 18, 1973 AND THE GOVERNMENT'S REFUSAL TO COMPLY

Insofar as the defendant Jackson is concerned, this prosecution originated on November 9, 1972 with the return of a five-count indictment charging him with mail theft in violation of 18 U.S.C. § 1708 which was docketed in this court as No. 72 CR 855 and assigned to my colleague, Judge Richard McLaren. Jackson was promptly arraigned, pretrial discovery proceedings were ordered and the cause was set for trial February 26, 1973.

On February 23, 1973, the trial date was vacated and a pretrial conference was ordered for March 9. At that pretrial conference Judge McLaren was advised that the Government anticipated the return of a new indictment which would name additional defendants and would supersede the then pending indictment. Accordingly, 72 CR 855 was continued until April 26, 1973 when it was dismissed on the Government's motion.

In the meantime, on March 13, 1973, indictment 73 CR 193 was returned and assigned to Judge McLaren. It is in 12 counts. Count one alleges an 18 U.S.C. § 371 conspiracy to commit mail theft and to forge Government checks, in violation of 18 U.S.C. §§ 1708 and 495. The remaining 11 counts charge either mail theft or forgery of Government checks. The indictment alleges a multi-defendant conspiracy to steal welfare and Social Security checks from the mail, forge endorsements thereon and negotiate them through a grocery store owned by Jackson. The other participants are alleged to be Linda Lloyd, Sandra Johnson (now deceased), Sherman Priddy, Tommie Williams, John Smith and Fred Jackson (who is said to be an un-indicted co-conspirator).

By May 18, 1973, all defendants had been arraigned and pleaded not guilty. In the meantime, at the request of the Government, discovery of 1200 handwriting exemplars was ordered from defendants Jackson and Lloyd.[2] The cause was set for trial June 11, 1973. On that date, for reasons not disclosed by the docket, it was continued for trial until September 10, 1973. Prior to that September date, the case was reassigned to me as a part of my initial calendar of approximately 190 civil cases and 25 criminal cases.

There were older cases on my calendar which had been set for trial in September. Accordingly, I vacated the September 10 trial date and held status reports in the case on September 5 and November 5. At the September 5 hearing, I was advised by the Government that the defendants Jackson and Lloyd had not complied fully with the earlier order directing them to furnish handwriting exemplars. I ordered them to do so by October 5, and so far as I am aware, they did.

During the course of the status reports, I was advised by the Government that the trial would be quite lengthy in view of the number of defendants and the large number of checks involved in respect to which the Government would be obliged to prove authenticity, mailing, non-receipt by the intended payees, possession by one or more of the defendants, forgery of endorsements, and a comparison of the handwriting of the alleged forged endorsements with that of certain of the defendants.

---

1. An early mentor once observed to me that there is no advocate so insistent as a judge who has made up his mind.

2. Each was ordered to write 10 times, the names appearing in 120 different alleged forged endorsements.

By November 5, 1973, my calendar had started to shape up. I set the case for trial on January 8, 1974. That was the date that the new January, 1974 jury was to report. Several weeks of trial time were blocked out for the case. Shortly thereafter, on November 9, 1973, I ordered the cause set for a pretrial conference on December 18, 1973. See Rule 17.1, Fed.R.Crim.Pro.

The December 18 pretrial conference was attended by five attorneys representing the five remaining defendants (Sandra Johnson had died) and counsel for the Government. At the outset there was an oral request by counsel for the Government for a continuance of the January 8, 1974 trial date. As I recall the grounds for the continuance were that the Assistant United States Attorney assigned to the case could not meet the January 8 setting. If the case had proceeded to trial in January, it would have been necessary to reassign it to another assistant prosecutor. As the minute order entered on that date reflects, all of the defendants other than Blackburn Jackson agreed to the continuance. He, having been under indictment by that time for more than 13 months, objected, stating that he would be ready for trial on January 8 and demanded trial. On the Government's motion, the cause was continued for trial to April 15, 1974.[3]

During the pretrial conference, the Government again stated that the trial of the case would be time consuming because of the large number of checks and witnesses involved. The estimated numbers of each hovered at 100. Experienced defense counsel sat and listened to the description of what lay ahead. In these circumstances the following order was entered:

" . . . discovery ordered closed March 1, 1974; on or before April 1, 1974 all parties shall submit pretrial materials to the trial judge consisting of stipulation of uncontested facts; agreed statement of contested issues; list of witnesses to be called by the parties, exhibits to be offered by the parties—pre-marked with copies of documents attached; trial briefs stating facts parties expect to prove and the theories of liability, together with authorities based thereon and authorities with respect to all anticipated evidence questions; suggested voir dire examination of the jury; suggested instructions [on] contested issues of fact. . . ."[4]

In addition, a final pretrial conference was scheduled for April 8, 1974.[5]

No objection to the pretrial order was voiced at the conference by counsel for any party, although counsel for the Government did observe that it was unusual and might provoke some interest in the office of the United States Attorney.

In the ensuing 3½ months no objections were made. On the other hand, during that period, I did receive the advice of counsel for the Government and counsel for two of the defendants that they were contemplating changing their pleas to guilty.[6]

On April 1, 1974, counsel for defendant Blackburn Jackson appeared at my chambers with his pretrial materials pursuant to the December 18 order. He stated that he was prepared to file the materials but had been advised by coun-

---

3. The length of the continuance was determined in part by the fact that I had specially set for February 4, the first Monday of that month, a lengthy mail fraud prosecution (which proceeded to trial on schedule and consumed four weeks of trial time) to be followed by a lengthy civil securities case brought under Rule 10–b(5) of the Securities Exchange Commission, in which the parties were in need of a prompt resolution of their dispute. The trial of the securities case concluded on Thursday, April 4.

4. Compare United States v. Leichtfuss, 331 F.Supp. 723, 734 (N.D.Ill.1971).

5. On March 21, 1974, the case was advanced for trial to April 8, in light of the anticipated conclusion of the case I was then hearing. Fn. 3, *supra*.

6. On April 9, 1974, defendants Lloyd, Priddy and Smith pleaded guilty.

sel for the Government that the Government was unwilling to comply with certain portions of the order. I instructed him to withhold his materials until he was assured that they would be met with reciprocity. He has, since then, filed the materials and they comply fully with the order.

At 4:21 p. m. on April 1, 1974, the due date for the pretrial materials, three and one-half months after the entry of the pretrial order, and without notice to the defendants or notice to or leave of court, the Government filed with the central filing office of the Clerk of the Court, a motion for "clarification" of the December 18, 1973 order. In that motion, for the first time, the Government asserted that "absent a showing of materiality and necessity . . . [a] district court is not authorized by the Federal Rules to order discovery of the Government's list of witnesses or theory of prosecution." The motion concluded that the Government sought "clarification of the order so as to be in a position to determine whether to obtain appellate review."

When the motion for "clarification" came to my attention on the morning of April 3, I instructed my minute clerk to notify the parties that I would hear them at 2:00 p. m. that afternoon. At that hearing the Government stated that the "clarification" which it desired was whether the court would make available to the defendant the names of the anticipated witnesses for the Government and the Government's theory of the case. In a colloquy which, I regret, was somewhat heated on my part, I made clear that I expected the Government to serve upon counsel for the defendants copies of any materials which it delivered to me; that it would, in my judgment, be inappropriate for me to receive an ex parte communication from the Government in a criminal case.

On April ·3, 1974, the Government filed materials in partial compliance with the December 18 order. It express-

ly refused to submit a list of witnesses to be called at trial and its theory of the case upon the ground that "the court lacks authority under the Federal Rules of Criminal Procedure to require the Government to disclose to the defense either the list of witnesses the Government intends to call at trial or the Government's theory of its case." It also declined, upon the grounds of "the volume of exhibits and expense of reproduction" to file pre-marked copies of its documentary exhibits. The Government's partial submission concluded: "The remedies now open to the court are dismissal of the indictment or suppression of the testimony of the witnesses which are undisclosed." [7] At that point we were five days from a specially set trial date.

In accord with the Government's invitation, defendant Jackson moved to dismiss the indictment upon two grounds: (1) the Government's failure to comply with the pretrial order and (2) the denial of Jackson's Sixth Amendment right to a speedy trial, he having now been under indictment for 17 months. I took that motion under advisement intending to rule on it by April 5 with a written opinion. My efforts were interrupted, however, by an emergency hearing which came to me in my capacity as emergency judge of this court. Accordingly, at 2:00 p. m. on April 5, 1974, I called counsel for the Government and Jackson before me and read into the record a portion of a draft of this opinion dealing with the authority of courts to enter pretrial orders of the nature here involved and why such orders contribute to the orderly administration of justice. Those thoughts are subsequently expressed in the text of this opinion. The statement concluded with the observation that the Government, like all litigants, must comply with the orders of the court. I went on to observe, however, that criminal prosecutions of the apparent significance of this one should not be disposed of other than on the

---

7. There are other remedies which are discussed, *infra*.

merits. Accordingly, I extended the time for the Government to comply with the pretrial order until 9:00 a. m. on Monday, April 8, when the final pretrial conference was to be held.

Within an hour of my statement from the bench, I received a telephone call from the office of the United States Attorney. I was told by an assistant other than the assistant responsible for the case, to go ahead and rule on defendant Jackson's motion to dismiss because the Government did not intend to comply with the order.

At the pretrial conference held April 8, the Government was true to its word. It again refused to comply with the order. Its counsel also advised me that it would seek review of any sanction which I imposed.

For the reasons herein stated, the motion of defendant Blackburn Jackson to dismiss the indictment as to him was sustained in its entirety. I found that the Government had wilfully failed to comply with a proper order of the court, that, as a consequence, the defendant Blackburn Jackson has been and will be denied a speedy trial as guaranteed by the Sixth Amendment to the Constitution of the United States, and that the most appropriate remedy in all of the circumstances was dismissal of the indictment with the entry of a judgment in bar of any future prosecution of Blackburn Jackson for the offenses alleged in indictment 73 CR 193. A judgment order to that effect has been entered.

## THE EXTENT OF THE PARTIES' COMPLIANCE

Pursuant to the pretrial order, the Government and defendant Jackson submitted trial briefs, proposed jury instructions, proposed voir dire examination of the jury (the Government suggested none), and an extensive stipulation of testimony and exhibits (which were not submitted).

In addition, the defendant Jackson stated the persons he desired to be called as witnesses at the trial and disclosed his anticipated defense—coercion.

The Government eagerly embraced Jackson's willingness to comply with the pretrial order. Thus, its materials state that "the *only* contested issue present is whether defendant Jackson was coerced into the criminal acts charged in the indictment." (Emphasis supplied.) From that, one might surmise that the Government contemplated no need to establish a prima facie case of the defendant's criminal liability.

In addition, the Government willingly accepted Jackson's stipulation of the testimony of 87 witnesses (issuers and payees of checks) which the Government desired to call in its case in chief. The same stipulation covered 81 checks, their mailing, and the fact that the endorsements thereon were forgeries, i. e., were not made or authorized by the payees.

Thus, it was the defendant Jackson and his counsel who participated in the pretrial proceedings within the spirit in which the order was entered. When one contemplates the pervasive interdiction of the Fifth Amendment with respect to stipulations in criminal cases, the defendant's willingness to shorten the trial of the case can be appreciated.

## THE EXTENT OF THE GOVERNMENT'S REFUSAL

As previously noted, the Government refused to state its theory of the case, name the witnesses it would call at trial and submit pre-marked copies of its documentary exhibits.

Despite its asserted refusal to do so, the Government did disclose its theory of the case. Indeed, as previously noted, it so enthusiastically embraced the defendant's disclosures that it disclosed the theory by which it intended to meet Jackson's anticipated defense of coercion. While the case might have been tedious, it was not particularly complex. The indictment, together with the Government's trial brief and proposed instructions were a sufficient statement of its theory to satisfy the purposes of the

pretrial order in this case. Thus, the dismissal was not based on this professed refusal. It should be noted, however, that under different circumstances, the Government's case might warrant greater ventilation.

A somewhat different situation is presented by the declination to furnish pre-marked copies of exhibits, According to the materials submitted by the Government, the exhibits consisted of 81 checks which had been stipulated to, plus bank records of the South Central Bank and Trust Company, presumably relating to the negotiations of the several checks alleged in the indictment. Curiously, no mention was made of the Jackson and Lloyd handwriting exemplars which I assumed would be used to prove who committed the alleged forgeries. In any event, the Government assured me that the exhibits had been "shown" to defense counsel but, "Due to the volume of the exhibits and the expense of reproduction, copies thereof [were] not . . . attached." Having no reason to doubt the impecunious condition of the Government, I accept its protestation, pausing only to observe that most trial lawyers and judges recognize that considerable trial time is saved—at a remarkably modest cost—if the trial court is provided with a set of exhibits which can be used at a pretrial conference, reviewed in advance of trial and utilized during the trial so as to avoid the unnecessary interruption which attends tendering the exhibits to the court each time one is offered. And that is particularly true where, as here, counsel knows that certain characteristics of the documents—i. e., who signed the forged endorsements—are likely to be sharply disputed. So much for the exhibits.

The refusal to identify witnesses is, however, another matter. Here no arguable compliance was made nor was any excuse offered for non-compliance. The Government simply asserted that absent a showing of materiality and necessity I lacked the authority under the Federal Rules of Criminal Procedure to require disclosure of the Government's witnesses

to all parties a month after discovery had been closed and a week before a final pretrial conference was scheduled to be held. Indeed, in the final analysis, the Government's refusal to make disclosure went to the day of the final pretrial conference (which, as previously noted, was also the day of trial, fn. 5, *supra*).

## THE AUTHORITY TO ORDER DISCLOSURE

The Government's assertion of lack of authority cuts too thin. It assumes that the Federal Rules of Criminal Procedure are the sole source of the "authority" of district courts with respect to the management and trial of criminal cases.

District courts are constitutional courts contemplated by Article III of the Constitution. "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." In implementation of Article III, Congress has created district courts (28 U.S.C. § 132(a)) providing that "Except as otherwise provided by law, or rule or order of court, the judicial power of a district court with respect to any action, suit or proceeding may be exercised by a single judge. . . ." 28 U.S.C. § 132(c). District courts, as thus created, "have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231.

It was in the light of this broad grant of jurisdiction to district courts' and their judges that the Congress authorized and the Supreme Court adopted "rules of pleading, practice, and procedure with respect to any or all proceedings . . . in criminal cases . . . ." 18 U.S.C. § 3771. Of course, the Rules have the effect of law. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). And they are a source of authority. E. g., Rule 28(a), Fed.R.Crim.Pro. authorizing court appointment of expert witnesses. But they are not the sole source of au-

thority. United States v. Dockery, 50 F.Supp. 410 (D.N.Y.1943). As the Supreme Court observed in Palermo v. United States, 360 U.S. 343, 348, 79 S. Ct. 1217, 1222, 3 L.Ed.2d 1287 (1959), in sustaining and construing 18 U.S.C. § 3500, "Congress had determined to exercise its power to define the rule that should govern in this particular area in the trial of criminal cases instead of leaving the matter to *the lawmaking of the courts.*" (Emphasis supplied.)

Without denigrating their importance to the administration of criminal justice, it is accurate to say that the Rules are more regulators than creators of authority. Absent their provisions, there remains the twin grants from the Constitution and the Congress of judicial power which can be exercised by a district judge "Except as otherwise provided by law, or rule or order of court . . ." 28 U.S.C. § 132(c). Accordingly, it is inaccurate to assert that, absent the explicit mention of a given procedure in the Rules or Acts of Congress, a district court lacks authority to require a given procedure in a particular case. In clear recognition of this Rule 57(b) provides that "If no procedure is specifically prescribed by rule, the [district] court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute."

Turning to the particular subject at hand, virtually all of the authorities relied upon by the Government in support of its assertion that district courts lack authority to order pretrial disclosure of anticipated witnesses recognize instead the existence of that authority in the absence of any express provision in the Rules.

Its first cited case, United States v. Verse, 490 F.2d 280 (7th Cir. 1973), held that a trial court did not abuse its discretion when it denied a defendant's discovery motion for the disclosure of witnesses. To the same effect are United States v. Annoreno, 460 F.2d 1303, 1310 (7th Cir. 1972); United States v. Long, 449 F.2d 288 (8th Cir. 1971); United States v. Conder, 423 F.2d 904

(6th Cir. 1970); and Hemphill v. United States, 392 F.2d 45 (8th Cir. 1968). But it is one thing to say that a trial court does not abuse its discretion when it denies such disclosure. It is another thing to say that district courts lack the authority to require such disclosure in the exercise of that discretion. When the question has thus been squarely put, the authority has been found to exist. Will v. United States, 389 U.S. 90, 99, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); United States v. Leichtfuss, 331 F.Supp. 723, 732 (N.D.Ill.1971); United States v. Ahmad, 53 F.R.D. 186, 190–191 (M.D. Pa.1971); and see, United States v. Jordan, 466 F.2d 99, 101 (4th Cir. 1972); and United States v. Mahany, 305 F. Supp. 1205, 1209 (N.D.Ill.1969), recognizing the power but declining to exercise it.

More to the Government's point is the recent decision of the Ninth Circuit in United States v. Richter, 488 F.2d 170. There the court held that district courts do have the authority to order discovery of the identity of prospective witnesses. The court concluded, however, that a defendant's request for such disclosure should be made pursuant to and tested by the standards of materiality and reasonableness of Rule 16(b), Fed.R. Crim.Pro., and that the Government should be afforded the opportunity to seek a limiting or protective order pursuant to Rule 16(e). Because the Government had not been afforded an opportunity to seek such protection in *Richter,* an order of dismissal was reversed.

But *Richter* is not this case. In the first place, the order here was not one for discovery entered at the behest of the defendants. It was an order entered at the conclusion of a pretrial conference held pursuant to Rule 17.1. The disclosures were not to be made until 30 days after the close of discovery. They were to be mutual disclosures. Furthermore, in the 3½ months following the entry of the order, no suggestion was made by the Government of the need for protection of any witness or request for re-

straint on the defendants or their counsel with respect to contacting the witnesses. Rather the parochial notion was advanced that absent a showing by the defendant of necessity, district courts are powerless to control the orderly trial of a criminal case through pretrial disclosures of the nature ordered here. Totally ignored was the court's necessity made manifest at the conference on December 18, when the Government stated that the trial of this check theft and forgery case would involve approximately 100 witnesses and a like number, if not more, exhibits.

I cannot agree that a district court and the parties must be subject to such a cat and mouse approach to the trial of criminal cases. On April 5, when I extended the time for the Government to comply until April 8, I stated from the bench three purposes which are served by the disclosures. I elaborate on them here.

*First,* is the time to be allotted to the trial. In this context, it behooves all participants in the trial of cases in this district to recognize the situation which confronts us.

At the present time, criminal filings constitute numerically approximately 15% of the active cases in this court.[8] However, certain of the judges of this court are devoting from 50% to 75% of their trial time to criminal cases. The reason for this is the complexity of the criminal charges being returned and the length of trial attendant thereto. No criticism is intended by this observation. Quite the contrary: at the present, and hopefully for the future, the day is gone when only the less fortunate in our society are prosecuted. The full scope of the criminal sanctions adopted by the

Congress are being invoked against persons regardless of their station. And that is as it should be.

But the alleged criminal behavior of some persons is far more subtle and complex than that of others. Examples are unnecessary. They are well known to all of us—judges and lawyers alike—engaged in the administration of justice in this district.

If we are not to be swallowed up by our criminal cases; if we are to have any appreciable amount of time for the significant civil litigation which is pending before us (some of which has been brought by the Government) we must have the authority and receive the cooperation necessary to the orderly handling of the complex or lengthy criminal case.

We have achieved this goal insofar as civil litigation is concerned through the utilization of pretrial procedures akin to but much more extensive than that which were employed here. Those same devices must be available to us for the orderly handling of criminal cases.

What has this to do with listing witnesses? Simply this: the disclosure of theory of the case, exhibits and witnesses, not just in numbers but by identity as well, coupled with a final pretrial conference enables the trial judge to ascertain with some degree of reliability the length of time to be allocated to the trial of a *particular* case.[9] At the present time, we are subject to the estimates of trial counsel in criminal cases. Because we are committed (and I hope for the duration of my career on the bench) to the individual calendar system with its diverse challenges to the trial judge, it is imperative that trial judges be able to predict with some degree of

8. Bankruptcies and habeas corpus proceedings are excluded from that approximation.

9. The pretrial order used here with its attendant disclosures, stipulations and briefs, and hence lawyer work, is not necessary in all cases and I have not employed it in all cases. While I hold preliminary pretrial conferences in all criminal cases, oftentimes my only requests of counsel are anticipated instructions on the issues, requested voir dire examination and the names of prospective witnesses for use during voir dire. See, text *infra.* If the parties know that a jury will be waived, even these items are unnecessary. Insofar as trial briefs are concerned, capable counsel will frequently have them prepared without request.

certainty the duration of a given case. Absent this, we must either keep busy trial lawyers dangling on a day-to-day basis (always running the risk that when we need them they will be engaged elsewhere) or suffer the consequences of lost trial days at the end of a case which was glibly predicted would last one week and consumes two, or was predicted for two weeks and lasts four.

The *mutual* disclosure of witnesses, coupled with the other materials required by the pretrial order enables a judge to do this. A meaningful conference can be held during which the actual, as opposed to imagined, necessity for the testimony of certain witnesses can be ascertained. Additional stipulations can be sought and frequently obtained. Trial time, our one finite resource, can be conserved. Indeed, it may be avoided entirely through the disposition of cases without trial.[10] These ends cannot be accomplished in a vacuum. Statements of counsel as to the bare number of witnesses are insufficient. Our experiences in civil cases has taught us this. We cannot be blind to those teachings. United States v. Leichtfuss, 331 F.Supp. 723, 734 (N.D. Ill.1971). We must be ever mindful of the stated purposes of the Federal Rules of Criminal Procedure. They "are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." Rule 2, Fed. R.Crim.Pro.

*Second,* the *mutual* disclosure of the identity of witnesses prior to trial can expedite the actual trial of the case and conserve the energies of trial counsel. Cross-examination can be better prepared by both the Government and the defense when the identity of the witnesses is known in advance. Cross-examination can be purposeful rather than the rambling discursive exercises which trial judges and juries are frequently exposed to. Indeed, in retrospect, the order of disclosure here may not have been sufficient for these purposes for it required merely the names of witnesses. A more thoughtful order would require a modicum of disclosure with respect to the nature of the witnesses' testimony, i. e., transaction witness, victim, alibi, handwriting expert, etc. On the other hand those details can be flushed out at the final pretrial conference.

The energies of counsel should not be overlooked. While much was accomplished by stipulation in this case, there remained the potential of an undefined, unidentified number of witnesses being called to testify for the Government. Defense counsel faced with this potential has a choice of preparing cross-examination for all, none or some selected by chance. And we remind that the same is true of the Government.

Quite recently, in the trial of a complicated mail fraud case in which counsel for the Government and the defense had cooperated to a commendable degree with respect to the orderly presentation of the evidence, the defendants sought to call a witness "out of order." The Government was unprepared to cross-examine and requested that I either direct the defense to defer calling the witness or permit the witness to testify on direct examination, granting the Government overnight to prepare its cross-examination. The request was honored. The shoe pinches the foot that it is on.

*Third,* it is appropriate during the process of jury selection to enquire of the prospective jurors whether they are acquainted with any person who is likely to be a witness in the case. Throughout my career as a practicing trial lawyer this was a prophylactic procedure regularly engaged in by trial judges and trial lawyers during the voir dire examination of the jury panel in both civil

---

10. It is not amiss to observe that here, after the entry of the pretrial order, three defendants pleaded guilty. No inclination in that direction was manifest at the pretrial conference of December 18.

and criminal cases. We always enquire as to whether the prospective jurors are acquainted with the parties or their counsel. It is also desirable to inquire whether they are acquainted with any of the prospective witnesses. While affirmative answers are not frequently encountered, the occasions when they are make the enquiry worthwhile.

It is as undesirable for the administration of justice that a juror should find one of the witnesses for either party to be an acquaintance (with attendant personal attitudes toward the credibility of that witness) as it is for a juror to be acquainted personally with either the parties or counsel. As Mr. Justice Cardozo observed in Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), in which a juror was prosecuted for failing to disclose on *voir dire* her acquaintance with the defendant, "What was sought to be obtained was the choice of an impartial arbiter. What happened was the intrusion of a partisan defender. . . ."

Perhaps more to the point is United States v. Henson, 179 F.Supp. 474 (D.C. D.C.1959), in which a juror was found guilty of contempt because of her failure to disclose during the trial the fact that she recognized a witness called by the defense as the woman who had set the juror's hair on a couple of occasions and then realized that the witness was the defendant's mother. But if juror recognition of a witness occurs during the trial and is reported, how are we to cope with it? By individual interrogation of the juror? A mistrial? In United States v. Hooker, 12 Cr.L.R. 2514 (D.C. Sup.Ct.1973), the court held that to safeguard against the problem, pretrial disclosure of defense witnesses can be compelled to be used in the voir dire examination of the jury under the District of Columbia Superior Court rule 24(a) which is the same as Rule 24(a), Fed.R. Crim.Pro.

■ The pretrial order entered in this case on December 18, 1973 had for its purposes the foregoing objectives. It contemplated a mutual exchange of materials. It was, in my judgment, reasonable, fairly timed and within my authority. The defendant Jackson fully complied with it. If the orders of the court are to have any vitality, the Government must do likewise. This it refused to do.

## THE APPROPRIATE REMEDY

■ The Government has volunteered that "the remedies now open to the court are dismissal of the indictment or suppression of the testimony of the witnesses which are undisclosed." Either of these were preferable for the Government because each would have produced a reviewable order.

There were, however, two other alternatives. We could have proceeded to trial, had jeopardy attach and exclude the testimony of the unlisted witnesses. As I read the stipulated evidence, it did not amount to a prima facie case. A non-appealable acquittal would have resulted which would have benefited the defendant Jackson. But that smacked too much of gamesmanship, which the order in question is intended to avoid. Furthermore, frenzied efforts by the Government for a writ of mandamus or prohibition from the Court of Appeals were predictable. Justice deserves to be administered deliberately.

A second alternative was contempt. But that would have completely lost sight of the defendant's interests. Small solace to him while the Government and a special prosecutor were jousting over the fate of the assistant prosecutor who happened to have drawn this assignment.

Neither of the Government's suggested "remedies" were completely satisfactory. Suppression of the anticipated testimony would have resulted in an interlocutory appeal during which the case would remain pending against Jackson. If the appeal were successful, the case would be remanded for trial. But such might be the result in the event of an affirmance, for the Government could attempt to cure its refusal.

Dismissal of the indictment upon the sole ground of the Government's refusal would carry the possibility of a result comparable to suppression. Jeopardy not having attached, if reversed the case would proceed to trial, if affirmed the Government could reindict.

The defendant's interests were deserving of protection. He had been under indictment for 17 months. He lost one trial date as a result of the superseding indictment; another for reasons which do not appear on the record; another when the case was reassigned to me; another—and this one over his express objection and demand for trial—to meet the conveniences of the Government; and now, most recently, another because of the Government's refusal to honor an order with which he had fully complied. An appeal will ensue, attended by still more delay.

 I have concluded that in the circumstances of this case the defendant should not be forced to stand trial if the Government is unsuccessful in its appellate challenge of its obligation to comply with the pretrial order. There are decisions reporting dismissals "with prejudice" in these circumstances (see, United States v. Richter, *supra*) but I do not understand the significance of that term in a criminal case. United States v. Clay, 481 F.2d 133 (7th Cir. 1973). Cf., Rule 41, Fed.R.Civ.Pro. So far as I am aware, unless jeopardy has attached or some other bar is interposed in behalf of the defendant, he may be reprosecuted following a pretrial dismissal of an indictment so long as the statute of limitations has not run at the time of reindictment.

In my judgment, it is the Sixth Amendment guaranty of a speedy trial which protects the defendant from the delay he has experienced and will experience here. Within the guidelines articulated by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and Moore v. Arizona, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973), I find that the length of delay between indictment and disposition on the merits has been and will be unreasonable, that the delay has been occasioned in the main by the Government (and none of it by the defendant), that the defendant Jackson has asserted his right to a speedy trial and that he has been prejudiced by the mere pendency of the charges made against him. Accordingly, the motion of defendant Blackburn Jackson to dismiss the indictment as to him has been sustained in its entirety and a judgment has been entered dismissing the indictment as to him and in bar of any future prosecution for the offenses alleged in indictment 73 CR 193.